## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| WISCONSINITES FOR ALTERNATIVES TO SMOKING AND TOBACCO, INC., *et al.*, | ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| DAVID CASEY, Secretary of the Wisconsin Department of Revenue, in his official capacity, | ) ) ) ) |
| Defendant. | ) ) ) |

Case No. 3:25-cv-552-wmc

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

To further address the Court's questions raised at the August 1, 2025 hearing on Plaintiffs' motion for preliminary injunction regarding the proper interpretation of 21 U.S.C. §§ 337(a) and 387p as applied to Wisconsin Statutes § 995.15 and briefly respond to several of the points made by Defendant in his supplemental memorandum (ECF No. 61), Plaintiffs respectfully file this supplemental memorandum. As explained herein, because section 995.15 compels compliance with the premarket authorization requirements of the Tobacco Control Act ("TCA") and, in so doing, generates a conflict with the FDA's exercise of discretion in enforcing those requirements, section 995.15 is not a permissible exercise of the State's police power under section 387p, but is rather impliedly preempted by section 337(a). Moreover, Plaintiffs are threatened with irreparable harm by the enforcement of section 995.15 starting September 1, 2025.

## I.     Plaintiffs are likely to succeed on the merits of their claim that 21 U.S.C. § 337(a) impliedly preempts Wisconsin Statutes § 995.15.

Defendant contends that section 995.15 is not impliedly preempted because the TCA's specific preservation and savings clauses, 21 U.S.C. § 387p(a)(1) and (a)(2)(B), allow the State to enforce the directory restrictions as a "measure relating to or prohibiting the sale . . . of tobacco

1

products by individuals of any age" (§ 387p(a)(1)) or as a "requirement[] relating to the sale . . . of tobacco products by individuals of any age" (§ 387p(a)(2)(B)). ECF No. 36 at 19-20.

If correct, Defendant's argument would mean that, in enacting section 387p, Congress intended to eviscerate 21 U.S.C. § 337(a), which states that all "proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States," with respect to tobacco products. The text, structure, purpose, and legislative history of the Food, Drug, and Cosmetic Act ("FDCA"), and the TCA, however, demonstrate that Defendant's interpretation is wrong. If (i) a restriction that a state qualifies as a "sales" restriction under § 387p compels partial or full compliance with some other provision of the TCA; and (ii) that compelled compliance generates a conflict with FDA's efforts to strike a balance between competing Congressional objectives in enacting the TCA, that state restriction is preempted by section 337(a). That is exactly the situation presented by section 995.15.

## A. The text and structure of the FDCA, including the Act's tobacco provisions, show that Congress intended section 337(a) to apply to tobacco products.

"[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "In determining Congress's intent [the Seventh Circuit] look[s] to 'the statute's language, structure, and purpose, [and] its legislative history.'" *Mach Mining, LLC v. Sec'y of Labor*, MSHA, 728 F.3d 643, 651 n.13 (7th Cir. 2013) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)); *see also Eli Lilly & Co. v. United States HHS*, No. 1:21-cv-00081-SEB-MJD, 2021 U.S. Dist. LEXIS 209257, at *57 (S.D. Ind. Oct. 29, 2021) (stating that, in interpreting statutes, Courts are instructed to "interpret the relevant words, not in vacuum, but with reference to the statutory context, structure, history, and purpose.") (quoting *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014)). And courts must "construe statutes in the context of the entire statutory scheme and avoid rendering statutory provisions ambiguous,

extraneous, or redundant." *Gillespie v. Equifax Info. Servs., L.L.C.*, 484 F.3d 938, 941 (7th Cir. 2007) (cleaned up).

Section 337(a) has been part of the FDCA since Congress enacted the Act in 1938. *See* 52 Stat. 1040, 1046 (1938). Chapter III of the FDCA—titled "Prohibited Acts and Penalties"— prohibits the interstate distribution of any "food, drug, device, or cosmetic that is adulterated or misbranded," and includes the FDCA's enforcement provisions. *Id*. at 1042, 1043-45. The FDCA's product-category-specific requirements, including the definitions of "adulterated" and "misbranded" as those terms are applied to categories of products, are located in Chapters IV, V, and VI. *See id*. at 1046 ("Chapter IV—Food"); 1049 ("Chapter V—Drugs and Devices"); *id*. at 1054 ("Chapter VI—Cosmetics").

The 1938 Act did not include any savings or express preemption clauses. But because the FDCA's subsequently enacted savings and express preemption clauses are product-category-specific, Congress has typically placed them in the FDCA chapter dedicated to that product category. *See, e.g.*, 21 U.S.C. § 346a(n)(8) (savings clause regarding food; located in Chapter IV); 21 U.S.C. § 350e(e) (preemption clause regarding food; located in Chapter IV); 21 U.S.C. § 350g(*l*)(6) (savings clause regarding food; located in Chapter IV); 21 U.S.C. § 360k(a) (preemption clause regarding medical devices; located in Chapter V); 21 U.S.C. § 364j (preemption and savings clauses regarding cosmetics; located in Chapter VI).[1] Significantly, no court has ever held that any of the FDCA's savings or express preemption clauses for food, drugs, medical devices, or cosmetics limits the scope of section 337(a)'s prohibition on parties other than the federal government enforcing the FDCA.

---

[1] Additional savings and preemption clauses are found in the FDCA at 21 U.S.C. §§ 379r, 379s, 379aa, and 379aa-1.

Indeed, Congress has recognized that because of the FDCA's structure, any statutory limitation on the scope of section 337 must come through an amendment to section 337, not through an amendment to provisions in one of the product-category-specific chapters of the FDCA. In 1990, Congress amended the FDCA through the Nutrition Labeling and Education Act ("NLEA"). Pub. L. 101-535, 104 Stat. 2353 (1990). The NLEA expanded FDA's authority over food labeling by revising various provisions within Chapter IV of the Act. The NLEA also limited the scope of section 337 by granting states the authority to enforce some of the FDCA's prohibitions on the distribution of "misbranded" food products. But Congress did not adopt that limitation on the scope of section 337 through an amendment to Chapter IV. Instead, it did so by amending section 337 itself to create a new subsection (b) that allows States to bring proceedings to enforce and restrain violations of certain food-related provisions of the FDCA. *See* 104 Stat. at 2362 (creating 21 U.S.C. § 337(b)).

Congress's decision to limit the scope of section 337 by amending section 337 makes sense. After all, people reading section 337 should not be expected to read every other provision of the FDCA, including provisions in other chapters of the FDCA, to find out whether Congress has limited the scope of section 337(a). Unlike with food products, Congress has never enacted a new subsection of section 337 that exempts tobacco products from the operation of section 337(a).

Consideration of various preemption provisions found in the FDCA reinforces the conclusion that Congress intended section 337(a) to apply to tobacco product requirements. In describing state requirements that are expressly preempted in several other provisions, Congress repeatedly used the formulation ". . . different from, in addition to, or *otherwise not identical to* . . ." the FDCA's requirements. *See* 21 U.S.C. §§ 364j(a), 379aa(h)(1), 379aa-1(h)(1), and 379s(a) (emphasis added). However, the TCA's express preemption provision, 21 U.S.C. § 387p(a)(2)(A),

does not include the term "otherwise not identical to." Congress's omission of that language reflects Congress's intent to impliedly preempt under section 337(a) state law requirements that are identical to the TCA's requirements because they incorporate the TCA's requirements by reference.

**B.    Based on pre-TCA case law, Congress understood section 337(a) could impliedly preempt state law duties if the "existence of" the TCA was a "critical element" of those duties.**

One well-settled canon of statutory construction is that courts must "assume that Congress is aware of existing [case] law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979)). So, courts must assume that Congress was aware of case law interpreting the FDCA—including *Buckman Company v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001)—when it passed the TCA in 2009.

In *Buckman*, the Court held that section 337(a) impliedly preempted the plaintiffs' state law claims because "the existence of [the FDCA] was a critical element" of the defendant's purported state law duties. 531 U.S. at 353. The Court reasoned that such "claims inevitably conflict with the FDA's responsibility" to enforce the FDCA "consistently with the [Agency's] judgment and objectives." *Id.* at 350; *accord Nathan Kimmel v. DowElanco,* 275 F.3d 1199, 1206 (9th Cir. 2002) (stating that the "key factor identified by the Supreme Court in concluding that Buckman's claims were pre-empted was that 'the existence of [the FDCA was] a critical element in [the] case'"). Therefore, when Congress passed the TCA in 2009, it knew that section 337(a) could impliedly preempt any state law if the existence of the TCA was a critical element of a person's duties under that state law. Had Congress wanted to avoid implied preemption of state law duties or claims that depend on the existence of the TCA, it would have amended section 337.

*Buckman* is also applicable to the TCA notwithstanding the TCA's preservation, express preemption, and savings clauses. The *Buckman* plaintiffs argued that there should be no finding of implied conflict preemption under section 337(a) because the FDCA included an express preemption provision for medical devices. *Buckman*, 531 U.S. at 863. That express preemption provision preempts any State law requirement "(1) which is different from, or in addition to, any requirement applicable under [the FDCA] to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under [the FDCA]." But the Court rejected the plaintiffs' argument because "neither an express preemption provision nor a savings clause 'bars the ordinary working of conflict preemption principles.'"). *Buckman*, 531 U.S. at 863-864 (quoting *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000)).[2]

### C. In enacting the TCA, Congress did not intend section 387p's preservation and savings clauses to insulate state sales restrictions that compel compliance with other provisions of the TCA from implied preemption under section 337(a).

The text, legislative history of the TCA, and the practical effect of section 387p's preservation and savings clauses demonstrate that Congress did not intend those clauses to insulate state sales restrictions that compel compliance with other provisions of the TCA from implied preemption under section 337(a).

#### 1. The plain language of section 387p suggests that Congress did not intend it to limit the applicability of section 337(a).

---

[2] "Conflict preemption" includes "implied preemption." *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) ("We have found implied conflict pre-emption where . . . state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'") (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *Petr v. BMO Harris Bank N.A.*, 95 F.4th 1090, 1102 (7th Cir. 2024) ("Conflict preemption applies to cases where . . . . the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

The plain language of section 387p's preservation clause demonstrates that Congress did not intend section 387p to limit the applicability of section 337(a). As codified in the United States Code, section 387p(a)(1) states: "Except as provided in paragraph (2)(A), nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority of . . . . a State . . . ."[3] The "subchapter" referenced in subsection (a)(1) is subchapter IX of the FDCA, the TCA's provisions relating to FDA's regulation of tobacco products. As codified in the United States Code, section 337(a) is found in subchapter III of the FDCA. If Congress had intended section 387p to limit the implied preemptive effect of section 337(a), it would not have referenced only the subchapter referencing the FDCA's tobacco provisions, but rather "Food, Drug, and Cosmetic Act" or "Act" to refer to the entirety of the FDCA or some other language to explicitly encompass section 337(a) in subchapter III. *See*, *e.g.*, 21 U.S.C. § 346a ("***Nothing in this Act*** preempts the authority of any State or political subdivision to require that a food containing a pesticide chemical residue bear or be the subject of a warning to other statement relating to the presence of the pesticide chemical residue in or on such food.") (emphasis added); 21 U.S.C. § 387a-1(a)(1)(A) (providing for the issuance of a final rule "under . . . the Federal Food, Drug, and Cosmetic Act"). The fact that Congress did not do so reflects Congress's intent for section 337(a) to apply equally to the TCA's requirements as to any other provision of the FDCA.

This conclusion is reinforced by cases addressing an express preemption provision similar to that found in section 387p. The TCA's express preemption provision, 21 U.S.C. § 387p(a)(2)(A), is modeled on the FDCA's express preemption provision for medical devices. *See*

---

[3] As originally enacted, the Tobacco Control Act used the term "chapter" instead of "subchapter." *See* Pub. L. 111-31, 123 Stat. at 1823. However, "chapter" as used there clearly referenced what was ultimately codified in the United States Code as subchapter IX of Chapter 9 of Title 21. *See* 123 Stat. at 1784 (referencing "Chapter IX—Tobacco Products").

21 U.S.C. § 360(k) (preempting any State or local requirement "which is different from, or in addition to, any requirement applicable under this Act to the device"). And federal "courts have generally agreed that" a state law claim survives preemption under section 360k only if it "is premised on conduct that both (1) violates the FDCA, and (2) *would give rise to recovery under state law even in the absence of the FDCA.*" *Scanlon v. Medtronic Sofamor Danek USA, Inc.*, 61 F. Supp. 3d 403, 411 (D. Del. 2014) (collecting cases) (emphasis added). Just as with section 360k, under 21 U.S.C. § 387p(a)(2)(A), a state law requirement that merely piggybacks on a TCA requirement is impliedly preempted. To not be subject to preemption, the state law requirement must be based on an identical requirement that independently exists under state statute or common law. Here, section 995.15 does not satisfy this test because it explicitly piggybacks on a provision of the TCA—21 U.S.C. § 387j. Section 995.15's directory-related requirements could not provide for either a legal duty by a seller of ENDS products or an action against that seller in the absence of the FDCA.

### 2. The TCA's legislative history suggests Congress did not intend section 387p's preservation and saving clauses to nullify section 337(a) with respect to tobacco products.

The legislative history of the TCA also indicates that Congress did not intend the TCA's preservation and savings clauses to limit the scope of section 337(a). When Congress was considering the TCA, members of Congress introduced an amendment that would have created a separate statutory scheme outside of the FDCA (including an agency outside of FDA) to regulate tobacco products. *See* H.R. Rep. No. 111-58, pt. 1, at 6 (Mar. 2009). That separate statutory scheme—the Youth Prevention and Tobacco Harm Reduction Act (the "THR Act")—included a provision substantively identical to 21 U.S.C. § 337(a) and a preservation clause identical to the one in the TCA. *See* H.R. 1261, THR Act § 104 ("All proceedings for the enforcement, or to

restrain violations, of this Act shall be by and in the name of the United States."), THR Act § 119 ("Preservation of State and Local Authority") (Mar. 3, 2009).

The authors of the THR Act understood that their proposed legislation's preservation clause (section 119) did not nullify their proposed legislation's section 337(a)-like provision (section 104). That understanding makes sense because one provision of an act cannot be read as implicitly nullifying another provision of that act. *See*, *e.g.*, *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 510 n.22 (1986) ("It is an elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.") (internal quotation and citation omitted); *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible to every clause and word of a statute, . . . rather than to emasculate an entire section.") (internal quotations and citation omitted).

So, it stands to reason that Congress did not interpret the TCA's preservation and savings clauses—21 U.S.C. § 387p(a)(1) and (a)(2)(B)—as implicitly excluding tobacco products from the scope of section 337(a). Rather, Congress intended section 337(a) to impliedly preempt statutes enacted pursuant to a State's preserved powers if those statutes generate a conflict with FDA's balancing of competing Congressional objectives in enacting the TCA.

> **3.** **Defendant's interpretation of section 387p would allow a State to deputize itself or private parties to enforce any of the FDCA's tobacco provisions and render the express preemption provision of section 387p(a)(2)(A) a nullity.**

As a practical matter, Defendant's interpretation would also impose no restrictions on a State's ability to deputize itself or private parties to enforce any of the FDCA's tobacco provisions and would render the express preemption provision of section 387p(a)(2)(A) a nullity.

For example, the FDCA requires tobacco product manufacturing facilities to register with FDA, *see* 21 U.S.C. § 387e(b); and it authorizes the federal government, and only the federal

government, to bring enforcement proceedings against anyone who sells a tobacco product manufactured in a non-FDA-registered facility.[4] But under Defendant's reading of section 387p, a State could enforce the section 387e(b) registration requirement through a "sales restriction" that prohibits the sale of tobacco products manufactured in non-FDA-registered facilities. As another example, the FDCA requires the manufacturer or importer of certain tobacco products to pay a quarterly "user fee" to FDA, *see* 21 U.S.C. § 387s; and it authorizes the federal government, and only the federal government, to bring enforcement proceedings against anyone who sells a tobacco product manufactured or imported by someone who has not paid the required user fee.[5] But under Defendant's reading of section 387p, a State could enforce the section 387s user fee requirement through a "sales restriction" that prohibits the sale of tobacco products manufactured or imported by a person who did not pay the required user fee.

The situations discussed in the previous paragraph are no different from the situation here. The FDCA requires the manufacturer of any "new tobacco product"—including an ENDS product—to obtain FDA marketing authorization through the premarket tobacco product application process under 21 U.S.C. § 387j. The FDCA also authorizes the federal government, and only the federal government, to bring enforcement proceedings against anyone who sells a

---

[4] The FDCA deems any tobacco product to be "misbranded" if it was manufactured in a non-FDA-registered facility, *see* 21 U.S.C. § 387c(a)(6); the FDCA prohibits the sale of any "misbranded" tobacco product, *see* 21 U.S.C. § 331(a); the FDCA authorizes civil and criminal enforcement proceedings for the sale of "misbranded" tobacco products, *see* 21 U.S.C. §§ 332, 333, 334; and the FDCA says that "all such proceedings" must be brought "in the name of the United States," *see* 21 U.S.C. § 337(a).

[5] The FDCA deems any tobacco product to be "adulterated" if it was manufactured or imported by someone who has not paid the required user fee," *see* 21 U.S.C. § 387b(4); the FDCA prohibits the sale of any "adulterated" tobacco product, *see* 21 U.S.C. § 331(a); the FDCA authorizes civil and criminal enforcement proceedings for the sale of "adulterated" tobacco products, *see* 21 U.S.C. §§ 332, 333, 334; and the FDCA says that "all such proceedings" must be brought "in the name of the United States," *see* 21 U.S.C. § 337(a).

new tobacco product that does not have FDA marketing authorization.[6] But under Defendant's reading of section 387p, a state could enforce the section 387j premarket authorization requirement through a "sales restriction" that prohibits the sale of tobacco products that require, but lack, FDA marketing authorization.

In short, under Defendant's interpretation, there would be no limitations on what TCA requirements states could indirectly enforce as "sales" restrictions or requirements. And, because states could enforce any TCA requirement under the guise of a sales restriction or requirement, the express preemption provision of Section 387p(a)(2)(A) that prohibits state requirements "different from, or in addition to, any requirement under [the TCA] relating to tobacco products standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products" would be rendered a nullity. Such an interpretation is to be avoided. *See Gillespie*, 484 F.3d at 941 ("We must . . . and avoid rendering statutory provisions ambiguous, extraneous, or redundant.") (cleaned up).

The declaration submitted by Stevie Staats, ECF No. 58, is illustrative of how Defendant's reading of section 387p could result in the nullification of its express preemption provision. It is well established that the FDCA "rests upon the constitutional power resident in Congress to regulate interstate commerce." *United States v. Walsh*, 331 U.S. 432, 434, (1947). However, as Staats testifies, the Wisconsin businesses for which she works "manufacture[], mix[], and sell[]"

---

[6] The FDCA deems any tobacco product to be "adulterated" if the product requires, but lacks, FDA premarket authorization, *see* 21 U.S.C. § 387b(6); the FDCA prohibits the sale of any "adulterated" tobacco product, *see* 21 U.S.C. § 331(a); the FDCA authorizes civil and criminal enforcement proceedings for the sale of "adulterated" tobacco products, *see* 21 U.S.C. §§ 332, 333, 334; and the FDCA says that "all such proceedings" must be brought "in the name of the United States," *see* 21 U.S.C. § 337(a).

custom e-liquid in brick-and-mortar retail locations in Wisconsin. ECF No. 58 at ¶¶ 2, 5.[7] These businesses sell these custom e-liquid products exclusively to in-state customers such that their operations do not affect interstate commerce. *Id.* at ¶¶ 2, 5. In such a situation, but for section 995.15, those manufacturers would not be subject to the FDCA's requirement that they submit an application for premarket authorization for their e-liquids in order to manufacture and sell their e-liquids on an entirely intrastate basis.

Under Defendant's interpretation of the language relating to "sales" in section 387p(a)(1)'s preservation clause and section 387p(a)(2)(B)'s savings clause, expanding the federal premarket review requirement to manufacturers that operate completely intrastate, like Staats' businesses, would be readily permissible because section 995.15 is merely a "sales" restriction. But this reading would render a nullity the express preemption language in section 387p(1)(2)(A) that prohibits any "requirement which is different from, *or in addition to*, any requirement under the provisions of this subchapter relating to . . . premarket review . . . ." (emphasis added). Because these businesses would not otherwise be subject to the FDCA's premarket review requirements due to their fully intrastate operations, section 995.15's imposition of those requirements on them is "in addition to" the requirements of the TCA.

Ms. Staats' situation illustrates why Defendant's claims regarding the scope of state sales restrictions that are permissible under 21 U.S.C. § 387p are overbroad and cannot include requirements that are duplicative of those found in the FDCA. In enacting the TCA, Congress did not intend section 387p's preservation and savings clauses to insulate state "sales" restrictions that

---

[7] These businesses are members of Plaintiff Wisconsinites for Alternatives to Smoking and Tobacco, Inc.

compel compliance with other provisions of the TCA from implied preemption under 21 U.S.C. § 337(a).

    **D.**    **Defendant's interpretation would allow state law requirements that actually conflict with federal requirements in violation of the Supreme Court's command that preservation and savings clauses do not bar the ordinary working of conflict preemption principles.**

Section 995.15 creates a genuine conflict with FDA's exclusive enforcement authority under 21 U.S.C § 337(a), and the discretion with which Congress entrusted the FDA to enforce 21 U.S.C. 387j. Yet Defendant's position is premised on the belief that Congress intended 21 U.S.C. § 387p's preservation and savings clauses to impede basic principles of conflict preemption even where actual conflict between the state and federal government's approaches exists. That is an illogical conclusion, and this Court should not accept it. *See*, *e.g.*, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 976 (7th Cir. 2004) ("We interpret statutes to avoid absurd results.") (citing *FutureSource L.L.C. v. Reuters Ltd.*, 312 F.3d 281, 284-85 (7th Cir. 2002) ("Nonsensical interpretations of contracts, as of statutes, are disfavored . . . not because of a judicial aversion to nonsense as such, but because people are unlikely to make contracts, or legislators statutes, that they believe will have absurd consequences.")).

"The ordinary principles of preemption include the well-settled proposition that a state law is preempted where it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 406 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (2002)). And as the Supreme Court has repeatedly declared, a savings clause "does *not* bar the ordinary working of conflict pre-emption principles."

13

*Geier*, 529 U.S. at 869; *cf.* 73 Fed. Reg. 49603, 49605 (Aug. 22, 2008) ("FDA does not believe that the absence of an express preemption provision with respect to drugs affects the application of the doctrine of implied preemption."). When state law permits "actions that 'actually conflict' with federal regulations, it would take from those who would enforce a federal law the very ability to achieve the law's congressionally mandated objectives that the Constitution, through the operation of ordinary preemption principles, seeks to protect." *Geier*, 529 U.S. at 872. "To the extent that such an interpretation of the savings provision reads into a particular federal law toleration of a conflict that those principles would otherwise forbid, it permits that law to defeat its own objectives, or potentially, as the [Supreme] Court has put it before, to 'destroy itself.'" *Id.* (quoting *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 228 (1998)).

When Congress enacted the TCA, it charged the FDA with reducing serious tobacco-related disease and death, which is primarily caused by traditional, combustible cigarettes. *See* TCA, § 3(9), 123 Stat. at 1782 (stating that one of the purposes of the TCA is "to promote cessation to reduce disease risk and the social costs associated with tobacco-related diseases").[8] One of the ways Congress identified to reduce such disease and death was to give FDA "new and *flexible*

---

[8] Among its findings supporting enactment of the TCA, Congress found that "approximately 8,600,000 Americans have chronic illnesses related to smoking." TCA, § 2(13), 123 Stat. at 1777. Those chronic illnesses include "cancer, heart disease, and other serious adverse health effects." TCA, § 2(2), 123 Stat. at 1777. Congress also found that reducing the use of tobacco by minors by 50 percent would prevent "over 10,000,000 of today's children from becoming regular, daily smokers," would save "over 3,000,000 of them from premature death due to tobacco-induced disease" and that "such a reduction in youth smoking would also result in approximately $75,000,000,000 in savings attributable to reduced healthcare costs." TCA, § 2(14), 123 Stat. at 1777. Congress also found that "because the only known safe alternative to smoking is cessation, interventions should target all smokers to help them quit completely." TCA, § 2(34), 123 Stat. at 1779.

enforcement authority" over "less harmful tobacco products." TCA, § 3(4), 123 Stat. at 1782 (emphasis added).

Since ENDS became subject to the FDA's regulatory authority in 2016, the FDA has continually communicated to the ENDS industry its policy of discretionary enforcement.[9] This is because the FDA has recognized that removing most or all ENDS products from the market would have negative health outcomes. In the FDA's own words, "[t]hrough enforcement [discretion] policies that FDA has revised over time, the agency has sought to strike a balance between the serious risk that e-cigarettes pose to youth and their potential benefit in helping adult smokers completely transition from or significantly reduce smoking combustible cigarettes." Compl., ¶ 53 and Exhibit B, ECF No. 1-4.

Congress entrusted the FDA with exclusive enforcement discretion to strike a balance between the risks and benefits to public health of allowing unauthorized ENDS products to remain on the market. Through its indirect enforcement of 21 U.S.C. § 387j, section 995.15 directly conflicts with the FDA's considered and communicated approach of enforcement discretion; it is therefore preempted. *See Farina v. Nokia, Inc.*, 625 F.3d 97, 123 (3d Cir. 2010) ("The Supreme Court's preemption case law indicates that regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption."); *cf. Sprietsma v. Mercury Marine*, 537 U.S. 51, 66-67 (2002) (noting that "a federal

---

[9] In his supplemental memorandum (ECF No. 61), Plaintiff claims for the first time that the FDA does not have *any* policy of enforcement discretion. This is incorrect. FDA's disclaimers of a "broad policy" of enforcement discretion and the lack of a "legal safe harbor" based on the pendency of a PMTA are fully compatible with FDA's multiple statements highlighted in Plaintiffs' previous briefing that, since 2021, the agency makes enforcement determinations on a "case-by-case" basis. In his response to Plaintiffs' statement of undisputed facts, Defendant did not dispute that since September 2021, FDA has exercised its enforcement discretion with respect to unauthorized ENDS products on a case-by-case basis. ECF No. 43 at ¶¶ 37 g. and h.

decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate.") (emphasis in original).

To read 21 U.S.C. § 387p to tolerate the conflict that section 995.15 creates with the FDA's approach of enforcement discretion when it comes to 21 U.S.C. § 387j would permit the FDCA to defeat its own objectives. It is antithetical to the principle of federal preemption that the existence of a savings provision would require the toleration of this conflict. *See Geier*, 529 U.S. at 871 ("Why . . . would Congress not have wanted ordinary pre-emption principles to apply where an actual conflict with a federal objective is at stake?"). For this fundamental reason, "[t]he [Supreme] Court has thus refused to read general 'saving' provisions to tolerate actual conflict . . . in "frustration-of-purpose" cases[.]" *Id*. at 873-74.

Federal courts have repeatedly held that state laws that conflict with or create an obstacle to a federal agency's enforcement discretion are preempted. *See e.g.*, *United States v. Iowa*, 126 F.4th 1334, 1347 (8th Cir. 2025) ("Even accepting Iowa's interpretation, Section 2 is still an obstacle to the exercise of the discretion that Congress gives to federal officials charged with enforcing federal immigration law.") (collecting cases), *underlying decision later vacated under Munsingwear*, No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025); *Arizona*, 567 U.S. at 406 ("Although § 5(C) attempts to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involves a conflict in the method of enforcement. The [Supreme] Court has recognized that a '[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.'") (quoting *Motor Coach Employees* v. *Lockridge*, 403 U.S. 274, 287, 91 S. Ct. 1909, 29 L. Ed. 2d 473 (1971)).

Not only does section 995.15 conflict with the FDA's method of enforcement of the FDCA by deputizing the WDOR to indirectly enforce 21 U.S.C. § 387j against sellers of ENDS products that lack premarket authorization, but it also creates an avenue for competing private parties to sue sellers of ENDS products that lack marketing authorization for double damages under Wisconsin's unfair and deceptive trade practices statutes. *See* Wis. Stat. § 100.20(2)-(4), (5). The deceptive trade practice designation also potentially subjects sellers of unauthorized products to criminal prosecution and civil penalties of up to $10,000 per violation. Wis. Stat. § 100.26(6). This goes <u>far beyond</u> the FDA's historical approach when it has determined that an ENDS product lacking marketing authorization should be removed from the market, which is to issue Warning Letters to "give individuals and firms an opportunity to take voluntary and prompt corrective action before [the FDA] initiates an enforcement action." *See* Food and Drug Administration Regulatory Procedures Manual, July 2024, Ch. 4 Advisory Actions, § 4-1-1, *available at* https://www.fda.gov/media/71878/download.

The Supreme Court "has repeatedly 'declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'" *Geier*, 529 U.S. at 870 (quoting *U.S. v. Locke*, 529 U.S. 89, 106 (2000)). So, too, should this Court decline to read 21 U.S.C. § 387p to tolerate this conflict.

### E. Even examining section 387p in isolation, section 995.15 would be expressly preempted because it imposes premarket authorization requirements that are "different from" or "in addition to" those set forth in 21 U.S.C. §§ 387j and 387e(i).

Even if one were to entirely ignore section 337(a) and implied preemption, section 387p(a)(2)(A) expressly preempts section 995.15 because it contains premarket review, adulteration, and registration requirements that are "different from" or "in addition to" those imposed by FDA pursuant to the TCA. And, as explained above, adopting Defendant's overbroad

17

interpretation of section 387p's savings clause would otherwise render section 387p(a)(2)(A)'s limitations on State authority a nullity.

Title 21 U.S.C. § 387j and 21 C.F.R. §§ 1114.1-1114.49 govern FDA's premarket review process for ENDS products. Under the FDCA, ENDS products that lack a marketing granted order are considered "adulterated" under 21 U.S.C. § 387b(6)(A) and their sale in interstate commerce is prohibited under 21 U.S.C. § 331(a)-(c). Moreover, manufacturers of tobacco products have an independent statutory obligation to register all tobacco products that they are manufacturing for commercial distribution under 21 U.S.C. § 387e(i). Failure to properly register a tobacco product similarly renders that product "adulterated" and prohibits its sale in interstate commerce. *See* 21 U.S.C. § 331(p).

Section 995.15 imposes specific requirements related to registration, premarket review, and adulteration that are not found in these provisions of the TCA or FDA's associated regulations. For example, to be registered in the WDOR's directory, in addition to submitting a PMTA to FDA, a manufacturer must pay an initial fee of $500 per product, along with an annual renewal fee of $500. *See* Wis. Stat. § 995.15(3). Neither the FDCA nor FDA requires payment of any such fee to register a business or an ENDS product with FDA, nor to submit a PMTA or obtain a marketing granted order from FDA. Section 995.15 also purports to require electronic vaping devices that do not contain or are not intended for use with nicotine, and so do not qualify as a "tobacco product" under 21 U.S.C. § 321(rr) or 21 C.F.R. 1110.3, such as pre-filled 0% nicotine products, to submit a PMTA to qualify for listing on the WDOR directory even though those products are not subject to the TCA or the premarket review requirements of 21 U.S.C. § 387j. *See* 21 U.S.C. §§ 387a(a),

387j(a)(1).[10] Finally, the above discussion of the businesses in the Staats declaration demonstrates how section 995.15 would extend the FDCA's premarket review requirements to manufacturers engaged in exclusively intrastate business and thereby impose on them premarket review requirements that are "in addition to" those that would otherwise apply to their purely intrastate business. For these additional reasons, even without considering the effects of section 337(a), the express preemption language of 21 U.S.C. § 387p(a)(2)(A) would prohibit enforcement of section 995.15.

## II.    Plaintiffs will suffer irreparable harm from the enforcement of Wisconsin Statutes § 995.15 absent injunctive relief.

The Wisconsin Director of Revenue ("WDOR") published the directory on August 1, 2025, and the Court permitted supplemental declarations specific to the impact on Plaintiffs' businesses. The supplemental declarations demonstrate that, should Plaintiffs be forced to only sell products on the Wisconsin directory, they will suffer irreparable harm.

Defendant continues to ignore the fact that sales of the Big Tobacco companies' ENDS products on the WDOR's directory are insufficient to prevent Plaintiffs from suffering permanent, irreparable harm to their businesses. Fifty-two of the ENDS products listed on the directory are R.J. Reynolds' VUSE products. Thirteen are Altria's NJOY products. Thirty-eight are Imperial Brands' (which sells Winston cigarettes) Blu products. And twenty-four are Juul Labs' products. Plaintiffs Distro Guys, The Supply Plus, and Nara Smoke currently sell some ENDS products listed on the directory, such as RJ Reynolds' VUSE and Juul, and yet those sales alone would be grossly insufficient to cover their operating expenses, let alone represent net profits. *See* ECF No.

---

[10] Indeed, if the Wisconsin Legislature had intended to simply ban non-nicotine vaping products that do not also contain hemp, Section 995.15 presents a highly convoluted and indirect method of doing so.

52 at ¶ 12; ECF No. 53 at ¶¶ 7-8; ECF No. 59 at ¶ 7. Plaintiff Distro Guys generated only 9.62%

of its revenues from sales of Juul and VUSE over the last year. ECF No. 59 at ¶ 7. Plaintiff The

Supply Plus generated only 1.18% of its revenues from Juul and VUSE products in the last year.

ECF No. 52 at ¶ 12(a)-(b). Plaintiff Nara Smoke's sales of products on the Wisconsin directory

account for only approximately 3% of its ENDS sales, while ENDS products as a whole account

for 83% of Nara Smoke's revenues. ECF No. 53 at ¶¶ 7-8. Plaintiff Johnny Vapes generates no

revenue from the sales of ENDS products listed on the Wisconsin directory other than bottled e-

liquids. ECF No. 54 at ¶ 10 .

As for the bottled e-liquid products listed on the directory, Defendant disregards the harm

that Plaintiffs will experience once enforcement of section 995.15 begins. The sales of the Naked

100 and Halo bottled e-liquid, the only brands listed on the directory, are insufficient to maintain

a profitable business. Plaintiffs The Supply Plus, Nara Smoke, Johny Vapes, and Distro Guys

currently sell or have sold in the past the Naked 100 bottled e-liquid. *See* ECF No. 52 at ¶ 12; ECF

No. 53 at ¶¶ 7-8; ECF No. 54 at ¶ 10; ECF No. 59 at ¶ 7. Plaintiff The Supply Plus generated only

.02% of their total revenue from the Naked 100 products and no revenue from the Halo bottled e-

liquids over the last year. ECF No. 59 at ¶ 7. Plaintiff Nara Smoke generated only approximately

$3,213 of total revenue from sales of Naked 100 e-liquids and no revenue from the Halo bottled

e-liquids over the last year. ECF No. 53 at ¶ 7. Plaintiff Johny Vapes generated only $22,100.89

of total revenue from sales of Naked 100 e-liquids and no revenue from the Halo bottled e-liquid

over the last year. ECF No. 54 at ¶ 10. Plaintiff Distro Guys generated only .04% of their total

revenue from sales of Naked 100 e-liquids and no revenue from the Halo bottled e-liquid over the

last year. ECF No. 59 at ¶ 7. Defendant's claim that Plaintiffs could simply switch to the products

listed on the directory is incorrect, unrealistic, and would cause Plaintiffs to go out of business.

Even more importantly, as discussed at the hearing and in the supplemental declarations, there are no open-system, refillable ENDS devices listed on the directory. Thus, once enforcement of Wisconsin Statutes § 995.15 starts, sales of the Naked 100 or Halo bottled e-liquid products will drop quickly because there are no compatible devices with which to use these products. This is the case because, as discussed at Mr. Beaupre's deposition, consumers will need to replace the coils used in these devices every "seven days" and with no such devices or replacement coils listed in the directory, these e-liquids are useless. *See* ECF No. 67 at 12:20-14:16. Instead, what is likely, if not inevitable, upon enforcement of section 995.15 is that Plaintiffs will be unable to sell most, if not all, of their inventory of these bottled e-liquid products that are listed on the directory when the products expire and absorb the financial pain from the lost sales.

Not only will enforcement of section 995.15 impact Plaintiffs' ENDS sales, but it will force many Plaintiffs to close their businesses for good. For example, Plaintiff The Supply Plus anticipates a minimum of a 65% decrease in revenue once enforcement starts. ECF No. 52 at ¶ 16. This figure does not account for the loss of sales of non-vaping products, including cigars, CBD products, apparel, snacks, and drinks, that consumers purchase when they come to the stores to purchase their preferred ENDS products. *Id.* Plaintiff Nara Smoke generates approximately 83% of its revenue from the sales of ENDS products and Nara Smoke will "certain[ly]" be forced to close once enforcement starts. ECF No. 53 at ¶ 8. Plaintiff Johny Vapes will be forced to close all stores. ECF No. 54 at ¶¶ 10-14. Plaintiffs will be left with hundreds of thousands of dollars in ENDS product inventory that they will no longer be able to sell once enforcement of section 995.15 starts. ECF No. 52 at ¶ 19; ECF No. 54 at ¶ 16.

Furthermore, it would be difficult, if not impossible, for Plaintiffs to even obtain inventory of the ENDS products that are listed on the directory at prices that would be competitive. ECF No.

21

52 at ¶ 17; ECF No. 57 at ¶¶ 8-23. R.J. Reynolds, one of the largest cigarette manufacturers in the country, "fund[s] . . . [VUSE] Alto offers . . . through cigarette programs/profits" when selling its ENDS products to gas stations and convenience stores. ECF No. 57 at ¶ 18. Based on their many years of experience in the industry, Plaintiffs are unable to take advantage of these offers from Big Tobacco companies because Plaintiffs do not sell traditional cigarettes.

Defendants' supplemental brief also offers arguments regarding non-tobacco- and non-menthol-flavored ENDS products that are factually incorrect, conjectural, and based on inadmissible hearsay. Contrary to Defendant's speculation (ECF No. 61 at 13), it certainly is <u>not</u> the case that FDA has said it will never authorize a non-tobacco- or non-menthol-flavored product. *FDA v. Wages & White Lion Investments, LLC*, 145 S. Ct. 898 (2025), was about FDA's criteria for granting marketing authorization for such non-tobacco-flavored products and whether unannounced changes FDA made to those criteria a year after premarket applications had been submitted were arbitrary and capricious, not about whether FDA was imposing a blanket ban on authorizing such products.[11] *See*, *e.g.*, FDA's Reply Brief in Support of Petition for Certiorari[12] at 4 ("And the fact that FDA has reached similar results in evaluating different manufacturers' flavored e-cigarette products . . . shows that it is applying the statute consistently, not that it has

---

[11] The undersigned argued *Wages* before the Supreme Court on behalf of the respondents. Contrary to Defendant's claims, *Wages* did not involve the denials of applications for millions of flavored products, but only those of a single manufacturer. FDA's post-2021 case-by-case enforcement approach was also not at issue in that case. The case remains pending on remand before the Fifth Circuit (which previously, sitting *en banc*, ruled for the manufacturers), including on issues relating to disguised rulemaking through adjudication that the Supreme Court declined to address because they were outside of the scope of its grant of certiorari.

[12] Available at
https://www.supremecourt.gov/DocketPDF/23/231038/314319/20240604183638817_WagesCert
Reply.pdf

adopted a de facto ban on such products."); FDA's Reply Brief[13] at 21 ("The Fifth Circuit also stated that FDA had improperly imposed a 'categorical ban' on all flavored e-cigarettes. . . . But we have already explained why it is wrong. FDA's denial orders do not mention any such ban, and the agency has since authorized the marketing of some flavored products."). Defendants' claim that FDA "has concluded that the public health risks of favored nicotine vape products outweigh their health benefits," ECF No. 61 at 13, is simply wrong as a matter of fact.

The availability of non-tobacco- and non-menthol flavors has aided thousands of adult smokers in breaking away from smoking traditional cigarettes. ECF No. 52 at ¶ 21; ECF No. 67 at 10-11, 25-27. Plaintiff Carmody cites having access to a variety of non-tobacco flavors as critical to preventing her from going back to smoking traditional cigarettes. ECF No. 22 at ¶¶ 8, 10. Plaintiff Wylie likewise testifies that having a variety of flavors and sizes of ENDS products available to him keeps him from returning to smoking traditional cigarettes. ECF No. 23 at ¶ 9. Plaintiffs do not contest that the State of Wisconsin could impose a ban on sales of flavored ENDS products if it so desired under 21 U.S.C. § 387p; that, however, is not what section 995.15 requires, and it is not the issue before this Court.

Absent an injunction, enforcement of Section 995.15 will cause Plaintiffs irreparable harm, including lost sales, lost customer goodwill, and the closure of many of Plaintiffs' stores.

## III.　Conclusion

For the foregoing reasons, the Court should find that Plaintiffs are likely to succeed on their claim that Wisconsin Statutes § 995.15 is impliedly preempted by 21 U.S.C. § 337(a), that

---

[13] Available at
https://www.supremecourt.gov/DocketPDF/23/231038/331324/20241106154759342_23-1038rbUnitedStates.pdf

Plaintiffs will suffer irreparable harm absent an injunction, and grant Plaintiffs' motion for preliminary injunction.

Dated: August 15, 2025     Kendall W. Harrison
            State Bar No. 1023438
            Jenna L. Riddle
            State Bar No. 1129373
            GODFREY & KAHN, S.C.
            One East Main Street, Suite 500
            P.O. Box 2719
            Madison, WI 53701-2719
            Phone: 608-257-3911
            Fax: 608-257-0609
            kharrison@gklaw.com
            jriddle@gklaw.com

            By:_____ s/ Eric N. Heyer_____
            Eric N. Heyer
            James C. Fraser
            Joseph A. Smith
            Anna Stressenger
            Ryan D. Callinan
            THOMPSON HINE LLP
            1919 M Street, NW, Suite 700
            Washington, DC 20036
            T: (202) 331-8800
            F: (202) 331-8330
            Eric.Heyer@ThompsonHine.com
            Joe.Smith@ThompsonHine.com
            James.Fraser@ThompsonHine.com
            Anna.Stressenger@ThompsonHine.com
            Ryan.Callinan@ThompsonHine.com

            *Counsel for Plaintiffs*