# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| WISCONSINITES FOR ALTERNATIVES TO SMOKING AND TOBACCO, INC., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:25-cv-552-wmc |
| v. | ) ) ) | |
| DAVID CASEY, Secretary of the Wisconsin Department of Revenue, in his official capacity, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>

GODFREY & KAHN, S.C.

Kendall W. Harrison
State Bar No. 1023438
Jenna L. Riddle
State Bar No. 1129373
One East Main Street, Suite 500
P.O. Box 2719
Madison, Wisconsin 53701-2719
Phone: 608-257-3911
Fax: 608-257-0609
kharrison@gklaw.com
jriddle@gklaw.com

*Co-Counsel for Plaintiffs*

THOMPSON HINE LLP

Eric N. Heyer
James C. Fraser
Joseph A. Smith
Anna Stressenger
Ryan D. Callinan
1919 M Street, NW, Suite 700
Washington, DC 20036
Phone: (202) 331-8800
Fax: (202) 331-8330
Eric.Heyer@ThompsonHine.com
Joe.Smith@ThompsonHine.com
James.Fraser@ThompsonHine.com
Anna.Stressenger@ThompsonHine.com
Ryan.Callinan@ThompsonHine.com

*Co-Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 3

STANDARD OF REVIEW .................................................................................................. 9

ARGUMENT ...................................................................................................................... 10

A.     Plaintiffs Have Article III Standing. ............................................................................ 10

B.     Plaintiffs Have Alleged Sufficient Facts to State a Plausible Claim for Implied Preemption. ................................................................................................................. 16

     1.     The text and structure of the FDCA, including the Act's tobacco provisions, show that Congress intended section 337(a) to apply to tobacco products. ........................................................................................... 18

     2.     Based on pre-TCA case law, Congress understood section 337(a) could impliedly preempt state law claims if the "existence of" the TCA was a "critical element" of those claims. ..................................................................... 20

     3.     In enacting the TCA, Congress did not intend section 387p's preservation and savings clauses to insulate state sales restrictions that compel compliance with other provisions of the TCA from implied preemption under section 337(a). ........................................................................................... 22

          a.     The plain language of section 387p suggests that Congress did not intend it to limit the applicability of section 337(a). ................................ 22

          b.     The TCA's legislative history suggests Congress did not intend section 387p's preservation and saving clauses to nullify section 337(a) with respect to tobacco products. ................................................. 24

          c.     Defendant's interpretation of section 387p would allow a State to deputize itself or private parties to enforce any of the FDCA's tobacco provisions and render the express preemption provision of section 387p(a)(2)(A) a nullity. ............................................................... 25

     4.     Section 995.15 conflicts with the FDA's discretion to take or refrain from taking enforcement action in furtherance of Congress's competing purposes in enacting the TCA. .................................................................... 27

     5.     Even examining section 387p in isolation, section 995.15 would be expressly preempted because it imposes premarket authorization requirements that are "different from" or "in addition to" those set forth in 21 U.S.C. §§ 387j and 387e(i). ......................................................................... 31

     6.     Plaintiffs are not limited to raising implied preemption under section 337(a) as an affirmative defense in an enforcement action. ............................ 33

C.      For these reasons, the fact that Plaintiffs invoke section 337(a) as part of their offensive claim for declaratory and injunctive relief provides no basis to conclude that section 995.15 is not impliedly preempted. Plaintiffs Have Alleged Sufficient Facts to State a Plausible Claim for a Violation of the Equal Protection Clause........................................ 36

CONCLUSION ........................................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Abbott Laboratories* v. *Gardner*,
   387 U.S. 136 (1967)........................................................................................................34

*ABF Freight Sys. v. Int'l Bhd. of Teamsters*,
   645 F.3d 954 (8th Cir. 2011) .......................................................................................12

*Abramski v. United States*,
   134 S. Ct. 2259 (2014)................................................................................................18

*American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*,
   524 U.S. 214 (1998)....................................................................................................28

*Apex Digit., Inc. v. Sears, Roebuck & Co.*,
   572 F.3 440 (7th Cir. 2009) .........................................................................................10

*Arizona v. United States*,
   567 U.S. 387 (2012)...........................................................................................28, 30, 31

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................................10

*Association of Data Processing Service Organizations Inc. v. Camp*,
   397 U.S. 150 (1970)....................................................................................................12

*Aurora Loan Services, Inc. v. Craddieth*,
   442 F.3d 1018 (7th Cir. 2006) .....................................................................................11

*Bazile v. Fin. Sys. of Green Bay, Inc.*,
   983 F.3d 274 (7th Cir. 2020) .......................................................................................10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................................10

*Bilek v. Fed. Ins. Co.*,
   8 F.4th 581 (7th Cir. 2021) .........................................................................................10

*Braidwood Mgmt. v. EEOC*,
   70 F.4th 914 (5th Cir. 2023) .......................................................................................33

*Brown v. Kemp*,
   86 F.4th 745 (7th Cir. 2023) .......................................................................................12

*Buckman Co. v. Plaintiffs' Legal Committee*,
   531 U.S. 341 (2001)...........................................................................................4, 13, 21, 22

*Cannon v. Univ. of Chicago*,
  441 U.S. 677 (1979)...........................................................................20

*Caterpillar Inc. v. Williams*,
  482 U.S. 386 (1987)...........................................................................16

*Center for Dermatology & Skin Cancer, Ltd. v. Burwell*,
  770 F.3d 586 (7th Cir. 2014) ............................................................9

*Christian County Clerk v. Mortgage Elec. Registration Sys.*,
  515 Fed. Appx. 451 (6th Cir. 2013).................................................12

*CSX Transp., Inc. v. Easterwood*,
  507 U.S. 658 (1993)...........................................................................18

*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017)...........................................................................16

*D.B. v. Kopp*,
  725 F.3d 681 (7th Cir. 2013) ............................................................38

*Depuy, Inc. v. Zimmer Holdings, Inc.*,
  384 F. Supp. 2d 1237 (N.D. Ill. 2005) .............................................11

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)...........................................................................12

*E. Edelmann & Co. v. Triple-A Specialty Co.*,
  88 F.2d 852 (7th Cir. 1937) ..............................................................33

*Eli Lilly & Co. v. United States HHS*,
  No. 1:21-cv-00081-SEB-MJD, 2021 U.S. Dist. LEXIS 209257
  (S.D. Ind. Oct. 29, 2021)...................................................................18

*Farina v. Nokia, Inc.*,
  625 F.3d 97 (3d Cir. 2010).................................................................29

*Farmworker Ass'n of Fla. v. Moody*,
  734 F. Supp. 3d 1311 (S.D. Fla. 2024) .............................................15

*FDA v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024)...........................................................................12

*Freightliner Corp. v. Myrick*,
  514 U.S. 280 (1995)...........................................................................22

*FutureSource L.L.C. v. Reuters Ltd.*,
  312 F.3d 281 (7th Cir. 2002) ............................................................27

*Garcia v. Wyeth-August Laboratories*,
  385 F.3d 961 (6th Cir. 2004) ................................................................. 35, 36

*Geier v. American Honda Motor Co.*,
  529 U.S. 861 (2000) ............................................................ 22, 28, 30, 31

*Giarratano v. Johnson*,
  521 F.3d 298 (4th Cir. 2008) ......................................................................... 38

*Gillespie v. Equifax Info. Servs., L.L.C.*,
  484 F.3d 938 (7th Cir. 2007) ................................................................... 18, 27

*Gov't Suppliers Consolidating Servs., Inc. v. Bayh*,
  975 F.2d 1267 (7th Cir. 1992) ..................................................................... 16

*Grand River Enterprises Six Nations, Ltd. v. Knudsen*,
  No. 23-35494, 2024 U.S. App. LEXIS 14597 (9th Cir. June 14, 2024) .......................... 34, 35

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982) ..................................................................................... 27

*Heckler v. Chaney*,
  470 U.S. 821 (1985) .................................................................................. 4, 13

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) .................................................................................. 22, 28

*Iddir v. INS*,
  301 F.3d 492 (7th Cir. 2002) ........................................................................... 10

*Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue*,
  __ F. Supp. 3d ___, No. 4:24-cv-00448-SMR-HCA,
  2025 U.S. Dist. LEXIS 85732 (S.D. Iowa May 2, 2025) ........................................ 14

*Johnson v. C.R. Bard Inc.*,
  No. 19-cv-760-wmc, 2021 U.S. Dist. LEXIS 85960 (W.D. Wis. May 5, 2021) ...................... 4

*Lac Du Flambeau Band v. Norton*,
  422 F.3d 490 (7th Cir. 2005) ........................................................................... 16

*Levenstein v. Salafsky*,
  164 F.3d 345 (7th Cir. 1998) ........................................................................... 10

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................................... 11

*Mach Mining, LLC v. Sec'y of Labor*,
  728 F.3d 643 (7th Cir. 2013) ........................................................................... 18

*Mary's House, Inc. v. North Carolina,*
  976 F. Supp. 2d 691 (M.D.N.C. 2013) ...................................................................38

*MedImmune, Inc. v. Genentech, Inc.,*
  549 U.S. 118 (2007)...............................................................................................34

*Miles v. Apex Marine Corp.,*
  498 U.S. 19 (1990)..................................................................................................20

*Minniecheske v. Vocke,*
  No. 89-1347, 1990 U.S. App. LEXIS 18436 (7th Cir. Oct. 19, 1990) ...................33

*Motor Coach Employees v. Lockridge,*
  403 U.S. 274 (1971)...............................................................................................30

*Nathan Kimmel v. DowElanco,*
  275 F.3d 1199 (9th Cir. 2002) ...............................................................................21

*Nexus Pharms., Inc. v. Central Admixture Pharm. Serv., Inc.,*
  48 F.4th 1040 (9th Cir. 2022) ................................................................................29

*NRA of Am. v. Magaw,*
  132 F.3d 272 (6th Cir. 1997) .................................................................................33

*Nucor Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V.,*
  28 F.3d 572 (7th Cir. 1994) ...................................................................................34

*Parker v. District of Columbia,*
  478 F.3d 370 (D.C. Cir. 2007) ...............................................................................12

*Petr v. BMO Harris Bank N.A.,*
  95 F.4th 1090 (7th Cir. 2024) ................................................................................22

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC,*
  2 F.4th 1001 (7th Cir. 2021) ..................................................................................10

*Reilly v. Will Cnty. Sheriff's Off.,*
  142 F.4th 924 (7th Cir. 2025) ................................................................................32

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
  547 U.S. 47 (2006)..................................................................................................15

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.,*
  786 F.3d 510 (7th Cir. 2015) .................................................................................32

*Scanlon v. Medtronic Sofamor Danek USA, Inc.,*
  61 F. Supp. 3d 403 (D. Del. 2014).........................................................................23

*South Carolina v. Catawba Indian Tribe*,
476 U.S. 498 (1986)...........................................................................24

*Sprietsma v. Mercury Marine*,
537 U.S. 51 (2002)............................................................................29

*Status Solutions, LLC v. JNL Techs., Inc.*,
No. 20-cv-01119-wmc, 2021 U.S. Dist. LEXIS 127205
(W.D. Wisc. July 8, 2021) .................................................................10

*Steffel v. Thompson*,
415 U.S. 452 (1974)...........................................................................34

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)...........................................................................16

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994)...........................................................................18

*Treadway v. Gateway Chevrolet Oldsmobile, Inc.*,
362 F.3d 971 (7th Cir. 2004) ............................................................27

*U.S. v. Locke*,
529 U.S. 89 (2000).............................................................................31

*United States v. Iowa*,
126 F.4th 1334 (8th Cir. 2025) .........................................................30

*United States v. Iowa*,
737 F. Supp. 3d 725 (S.D. Iowa 2024) .............................................15

*United States v. Menasche*,
348 U.S. 528 (1955)...........................................................................24

*Va. Uranium, Inc. v. Warren*,
587 U.S. 761 (2019)...........................................................................18

*Vapor Tech. Ass'n v. FDA*,
977 F.3d 496 (6th Cir. 2020) ..............................................................5

*Vapor Tech. Ass'n v. Wooten*,
No. 4:25-cv-00076-M-RJ, 2025 U.S. Dist. LEXIS 123020
(E.D.N.C. June 27, 2025)...................................................................14

*Wroblewski v. City of Washburn*,
965 F.2d 452 (7th Cir. 1992) .......................................................36, 37

*Wyeth v. Levine*,
    555 U.S. 555 (2009)..................................................................................18


**Statutes**

Consolidated Appropriations Act, 2022,
    Pub. L. No. 117-103, 136 Stat. 49 (2022)....................................................4

Family Smoking Prevention and Tobacco Control Act,
    123 Stat. 1776 (2009)...........................................................................3, 4

Food, Drug, and Cosmetic Act,
    Pub. L. No. 75-717, 52 Stat. 1040 (1938)..........................................3, 18, 19

Nutrition Labeling and Education Act,
    Pub. L. 101-535, 104 Stat. 2353 (1990)......................................................19

21 U.S.C. § 331..............................................................3, 15, 18, 25, 32

21 U.S.C. § 332...........................................................................18, 25, 26

21 U.S.C. § 333...........................................................................18, 25, 26

21 U.S.C. § 334...........................................................................18, 25, 26

21 U.S.C. § 337.......................................................................2, 4, 19, 25, 26

21 U.S.C. § 346a.......................................................................................19, 23

21 U.S.C. § 350e.............................................................................................19

21 U.S.C. § 350g.............................................................................................19

21 U.S.C. § 360...............................................................................................23

21 U.S.C. § 360k.............................................................................................19

21 U.S.C. § 364j......................................................................................19, 20

21 U.S.C. § 379aa...........................................................................................20

21 U.S.C. § 379aa-1........................................................................................20

21 U.S.C. § 379s.............................................................................................20

21 U.S.C. § 387...............................................................................................37

21 U.S.C. § 387a ....................................................................................................3

21 U.S.C. § 387a-1 ...............................................................................................23

21 U.S.C. § 387b ......................................................................................5, 19, 26

21 U.S.C. § 387c ...................................................................................................25

21 U.S.C. § 387e ...................................................................................................25

21 U.S.C. § 387f ...................................................................................................38

21 U.S.C. § 387j ........................................................................................... *passim*

21 U.S.C. § 387p .......................................................................................... *passim*

21 U.S.C. § 387s ...................................................................................................25

21 U.S.C. § 844 ....................................................................................................15

Wis. Stat. § 100.20 ........................................................................................2, 9, 30

Wis. Stat. § 100.26 .........................................................................................9, 30

Wis. Stat. § 254.92 ...............................................................................................38

Wis. Stat. § 995.15 ...................................................................................... *passim*

## **Regulations**

21 C.F.R. § 1308.11 .............................................................................................15

21 C.F.R. §§ 1114.1, et seq. ................................................................................32

## **Rules**

Fed. R. Civ. P. 12 ...............................................................................7, 9, 10, 38

Fed. R. Civ. P. 15 ................................................................................................33

## **Other Authorities**

2025 Wis. Act 15 ...................................................................................................2

FDA, *Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, 81 Fed. Reg. 28,974 (May 10, 2016) ..................................................................4

FDA, *Homeopathic Drug Products; Guidance for FDA Staff and Industry* 1 (Dec. 2022), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/homeopathic-drug-products-guidance-fda-staff-and-industry ........................................................................................................13

FDA, *Infant Formula Enforcement Discretion Policy: Guidance for Industry* (May 2022), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-infant-formula-enforcement-discretion-policy ...............................................................................................13

FDA, *Termination of the FDA's Unapproved New Drugs Initiative; Withdrawal*, 86 Fed. Reg. 28605 (May 27, 2021) .................................................................13

Food and Drug Administration Regulatory Procedures Manual, July 2024, *available at* https://www.fda.gov/media/71878/download ...................................31

H.R. Rep. No. 111-58 (Mar. 2009) ........................................................................24

6A Moore's Federal Practice para. 57.05 (2d ed. 1986) ........................................33

R. Gupta, et al., *The FDA Unapproved Drugs Initiative: An Observational Study of the Consequences for Drug Prices and Shortages in the United States*, 23 Journal of Managed Care and Specialty Pharmacy (Oct. 2017) ..............................13

FDA, *Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices*, 73 Fed. Reg. 49603 (Aug. 22, 2008) ......................28

Youth Prevention and Tobacco Harm Reduction Act, H.R. 1261 (Mar. 3, 2009) ........................24

## INTRODUCTION

Plaintiffs respectfully submit this memorandum in opposition to Defendant's motion to dismiss (ECF No. 34). Plaintiffs have Article III standing and plead plausible claims for declaratory and injunctive relief based on the Constitution's Supremacy Clause and the Fourteenth Amendment's Equal Protection Clause. Plaintiffs have Article III standing because they are threatened with an injury in fact by Defendant's enforcement of Wisconsin Statutes § 995.15. In Count I of their Complaint, Plaintiffs plead a plausible claim for a declaratory judgment that section 995.15 is impliedly preempted by 21 U.S.C. § 337(a) and for associated injunctive relief. Congress intended section 337(a) to apply to the FDCA's tobacco authorities and did not intend the preservation and savings provisions of the Family Smoking Prevention and Tobacco Control Act, 21 U.S.C. § 387p, to eviscerate the applicability of section 337(a) to tobacco products. Similarly, application of the proper standard of review to Count II of Plaintiffs' Complaint demonstrates that Plaintiffs plead a plausible claim that section 995.15 violates the Equal Protection Clause.

## BACKGROUND

This case involves the Wisconsin Department of Revenue's ("WDOR") regulation of electronic nicotine delivery system ("ENDS") products,[1] which the Food and Drug Administration ("FDA") has deemed to be "tobacco products" under the Food, Drug, and Cosmetic Act ("FDCA"). Wisconsin recently enacted Wisconsin Statutes § 995.15, which directs the WDOR to establish a directory of ENDS products approved for marketing and sale in Wisconsin. To be included on the

---

[1] ENDS heat a solution containing nicotine into an aerosol that the user inhales. Compl. ¶ 46. Unlike traditional cigarettes, ENDS do not contain any tobacco leaf, do not rely on combustion, and do not generate smoke. *Id.* The Food and Drug Administration has recognized that ENDS are likely to have fewer and lower concentrations of harmful constituents than traditional cigarettes, with less attendant risk of tobacco-related disease. *Id.* at ¶ 47.

directory, an ENDS product must either (1) have received an FDA marketing authorization; or (2) have been marketed in the United States as of August 8, 2016, and the manufacturer submitted a premarket tobacco product application ("PMTA") for the product to the FDA on or before September 9, 2020, and either the application remains under review by the FDA or a final decision on the application has not otherwise taken effect.[2] All proceedings for the enforcement of the FDCA's requirements, including the premarket authorization requirements set forth in 21 U.S.C. § 387j, must be "by and in the name of the United States." 21 U.S.C. § 337(a). But for the existence of 21 U.S.C. § 387j, section 995.15 would be non-sensical. Plaintiffs contend that Section 995.15 conflicts with and is preempted by the FDCA and the FDA's implementation of Congress's competing objectives through its discretionary enforcement approach to ENDS that lack FDA premarket authorization.

The WDOR published the electronic vaping device directory on August 1, 2025, and announced that enforcement would commence on September 1, 2025. Compl. ¶ 68; Exhibit J to Complaint, ECF No. 1-12. Plaintiffs are a trade association, manufacturer, retailers, and consumers of ENDS products in Wisconsin and are directly affected by Section 995.15. Compl. ¶¶ 12-19. If the business Plaintiffs continue to sell ENDS products not listed in the directory, they will be subject to monetary penalties, seizure of the unauthorized products, and suspension and revocation of their licenses to sell ENDS. *See* Wis. Stat. § 995.15(9)(c), (11)(a). Because Section 995.15 designates repeated sales of unauthorized products to be a deceptive trade practice, competitors can also file suit against violators for double damages and attorneys' fees. Wis. Stat. § 100.20(5);

---

[2] Section 995.15 was also recently amended to allow certain electronic vaping devices that contain hemp but do not include nicotine to be listed on the directory. Wis. Stat. § 995.15(2)(a)–(b); 2025 Wis. Act 15 §§ 352–54. The focus of Plaintiffs' claims, however, is on electronic *nicotine* delivery systems—i.e., those vaping products—be they devices or bottled e-liquids for use with refillable devices—that contain nicotine.

Wis. Stat. § 995.15(9)(c), (11)(a). And if the retailer Plaintiffs remove ENDS products not listed on the directory from their shelves, they will go out of business. Compl. ¶¶ 81-82, 93-94. Enforcement of Section 995.15 also means that the consumer Plaintiffs will not have access to the ENDS products upon which they rely to keep from reverting to more dangerous traditional cigarettes. *Id.* at ¶¶ 84, 96. Plaintiffs thus seek declaratory and injunctive relief against enforcement of section 995.15's directory-related restrictions. *Id.* at ¶ 97.

## STATEMENT OF FACTS

Congress enacted the FDCA in 1938 "to prohibit the movement in interstate commerce of adulterated and misbranded food, drugs, [medical] devices, and cosmetics." Pub. L. No. 75-717, 52 Stat. 1040 (1938). In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("TCA"), amending the FDCA to prohibit the movement in interstate commerce of certain adulterated and misbranded tobacco products, including traditional (combustible) cigarettes. *See* 21 U.S.C. § 331 (prohibiting the "introduction into interstate commerce of any food, drug, device, *tobacco product*, or cosmetic that is adulterated or misbranded") (emphasis added); 21 U.S.C. § 387a(b) (limiting the FDA's authority over tobacco products to, *inter alia*, cigarettes). One of Congress's stated purposes in enacting the TCA was to reduce serious tobacco-related disease and death—which is primarily caused by combustible cigarettes. *See* TCA, § 3(9), 123 Stat. 1776, 1782 (2009).[3] Another of Congress's stated purposes was to "provide new *and flexible*

---

[3] Among its findings supporting enactment of the TCA, Congress found that "approximately 8,600,000 Americans have chronic illnesses related to smoking." TCA, § 2(13), 123 Stat. at 1777. Those chronic illnesses include "cancer, heart disease, and other serious adverse health effects." TCA, § 2(2), 123 Stat. at 1777. Congress also found that reducing the use of tobacco by minors by 50 percent would prevent "over 10,000,000 of today's children from becoming regular, daily smokers," would save "over 3,000,000 of them from premature death due to tobacco-induced disease" and that "such a reduction in youth smoking would also result in approximately $75,000,000,000 in savings attributable to reduced healthcare costs." TCA, § 2(14), 123 Stat. at 1777.

enforcement authority to ensure that there is effective oversight of the tobacco industry's efforts to develop, introduce, and promote less harmful tobacco products." TCA, § 3(4), 123 Stat. at 1782 (emphasis added).

Since 1938, the FDCA has always included a provision specifying that only the federal government can enforce the Act. *See* 21 U.S.C. § 337(a) (stating that "all such proceedings for the enforcement, or to restrain violations, of this [Act] shall be by and in the name of the United States"). Because the FDCA gives the federal government the exclusive authority to enforce the Act, the Supreme Court and other federal courts have rejected attempts by other parties to challenge an FDA decision to not enforce a provisions of the Act. *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 835 (1985) (stating that the FDCA's enforcement provisions "commit complete discretion to [the FDA] to decide how and when they should be exercised"). And the Supreme Court and other courts have held that 21 U.S.C. § 337(a) impliedly preempts any claim that seeks to directly or indirectly enforce the Act. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001); *Johnson v. C.R. Bard Inc.*, No. 19-cv-760-wmc, 2021 U.S. Dist. LEXIS 85960, at *32 (W.D. Wis. May 5, 2021) (finding that a negligence per se claim alleging a violation of the FDCA is impliedly preempted by section 337(a) because the claim "exist[ed] solely by virtue of FDCA requirements").

In 2016, the FDA adopted a regulation that extended the agency's authority over tobacco products to ENDS products containing tobacco-derived nicotine. *See* 81 Fed. Reg. 28,974 (May 10, 2016). In April 2022, Congress further extended this authority to ENDS products containing non-tobacco-derived nicotine, including synthetically manufactured nicotine. *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, Division P, Title I, Subtitle B, §111(a) (amending the definition of "tobacco product" in 21 U.S.C. § 321(rr)(1) to include

products containing nicotine "from any source"). When ENDS containing tobacco-derived nicotine became subject to the FDCA in August 2016, they automatically became "adulterated" tobacco products until the manufacturer obtained FDA marketing authorization through the premarket tobacco product application ("PMTA") process. 21 U.S.C. §§ 387b(6)(A), 387j(a)(2)(A). The same was true for ENDS containing non-tobacco-derived nicotine in April 2022.

By August 2016, there were already many ENDS products with tobacco-derived nicotine on the market; likewise, there were numerous ENDS with non-tobacco-derived nicotine on the market by April 2022. Compl., ¶ 51. The FDA recognized that immediately forcing all unauthorized ENDS off the market while manufacturers go through the PMTA process could result in many ENDS users reverting to traditional cigarettes. *See Vapor Tech. Ass'n v. FDA*, 977 F.3d 496, 499 (6th Cir. 2020) (noting the FDA's view that removing all unauthorized ENDS from the market too quickly "creates a genuine risk of migration from potentially less harmful [e-cigarette] products back to combustible tobacco products," and that this would be a "public health outcome that should be avoided if at all possible"). Such a result would have been contrary to Congress's directive to reduce the incidents of disease and death resulting from the use of traditional tobacco products and to provide flexible enforcement authority to effectively oversee the introduction and promotion of less harmful alternatives.

Therefore, as FDA itself stated in 2023, "[t]hrough enforcement [discretion] policies that FDA has revised over time, the agency has sought to strike a balance between the serious risk that e-cigarettes pose to youth and their potential benefit in helping adult smokers completely transition from or significantly reduce smoking combustible cigarettes." Compl. ¶ 53 and Exhibit B, ECF

No. 1-4. To that end, since ENDS became subject to the FDCA in 2016, the FDA has revised its enforcement discretion policy no fewer than seven times. *Id*. at ¶ 54.

Since September 2021, the FDA's policy with respect to unauthorized ENDS has been to exercise enforcement discretion on a "case-by-case" basis, citing its authority to do so under the Supreme Court's *Heckler v. Chaney* decision. *Id*. at ¶ 54(g) and Exhibit F, ECF No. 1-8. In exercising its enforcement discretion, the FDA says it "is continuously evaluating new information and adjusting its enforcement priorities in light of the best available data," and that the agency "will take appropriate action regarding [ENDS] that are marketed without premarket authorization as warranted based on changed circumstances, new information, or to better address minors' use of those products." *Id*.

Evidently unsatisfied with how the FDA has exercised its enforcement authority over ENDS—which compete with their traditional cigarette products—"Big Tobacco" companies like R.J. Reynolds (maker of Camel and Lucky Strike brand cigarettes) and Altria (maker of Marlboro and Virginia Slims brand cigarettes) have encouraged the FDA to deviate from its current case-by-case enforcement policy. Compl. ¶ 43. R.J. Reynolds filed a citizen petition with the FDA in February 2023 requesting that the agency "adopt a new enforcement" policy because the FDA "was not [doing] enough" to prevent underage use of unauthorized ENDS. *Id*. at ¶ 55 and Exhibit G, ECF No. 1-9. The FDA denied Reynolds' citizen petition in November 2023. *Id*. at ¶ 59 and Exhibit I, ECF No. 1-11. In so doing, the FDA told Reynolds: "[W]e do not agree that FDA has taken insufficient compliance and enforcement action against illegally marketed ENDS products . . . To the contrary, we believe that FDA's comprehensive approach to this matter demonstrates the Agency's robust commitment to implementing and enforcing the law . . . and preventing their access to and promotion of use by youth." *Id*. The FDA also stated that it "is continuously

6

evaluating new information and, in making enforcement decisions, taking into account data on youth use and other risk factors." *Id.* at ¶ 60 and Exhibit I, ECF No. 1-11.

While its citizen petition was pending, R.J. Reynolds also filed a complaint at the United States International Trade Commission ("ITC") asking the Commission to, *inter alia*, bar the importation of certain unauthorized ENDS products against which the FDA had not taken enforcement action. Compl. ¶ 61. The FDA sent a letter to the ITC urging it to reject Reynolds' attempt to use the ITC to enforce the FDCA. Compl. ¶ 62 and Exhibit B, ECF No. 1-4. Citing 21 U.S.C. § 337(a), the FDA noted that Congress wants "decisions about the regulatory or compliance status of tobacco products and what products should be prioritized for enforcement [to] reflect the views of the agency charged with administering the FDCA." *Id.* The FDA also noted that 21 U.S.C. § 337(a) reflects congressional intent to have "uniform administration of the FDCA." *Id.*

Based in part on the FDA's letter, the ITC dismissed Reynolds' claim seeking to bar the importation of unauthorized ENDS. Compl. ¶ 63. The ITC reasoned that "it would usurp the FDA's authority to enforce the FDCA and impermissibly grant a private right of action to enforce the FDCA if the Commission were to institute an investigation based on the Reynolds complaint." *Id.*

The Wisconsin Legislature passed S.B. 268 in November 2023, and the Governor signed the bill into law on December 6, 2023.

Section 64a of S.B. 268, codified at Wisconsin Statutes § 995.15, directs the WDOR to do, in effect, what Reynolds asked the FDA to do via its March 2023 citizen petition and what Reynolds asked the ITC to do via its October 2023 complaint—*i.e.*, take enforcement action against persons selling ENDS that have not been authorized by the FDA unless the product was on the market by August 8, 2016, and the product has a pending PMTA that was filed by September 9, 2020. Compl. ¶ 66.

Section 995.15 requires the WDOR to establish and publish a directory of ENDS products by September 1, 2025, and to update that directory at least monthly. Wis. Stat. § 995.15(6). For an ENDS product to qualify for the directory, the product's manufacturer must certify that it agrees to comply with section 995.15's restrictions and either (1) that the manufacturer's product "has received a marketing authorization or similar order for the electronic vaping device from [FDA] pursuant to 21 U.S.C. § 387j," or (2) that the manufacturer's product was marketed in the United States by August 8, 2016, the manufacturer submitted a PMTA for the product to FDA by September 9, 2020, "and either the application remains under review by the [FDA] or a final decision on the application has not otherwise taken effect." Wis. Stat. § 995.15(2).[4] Manufacturers must notify WDOR of any material change to the information contained in their certifications, including "the issuance or denial of a marketing authorization or similar order by the [FDA] pursuant to 21 U.S.C. § 387j . . . or any other order or action by the [FDA] that affects the ability of the electronic vaping device to be introduced or delivered into interstate commerce for commercial distribution in the United States." Wis. Stat. § 995.15(5). Beginning on September 1, 2025, retailers are prohibited from selling—and manufacturers are prohibited from selling for retail sale—any ENDS products not listed in the directory. Wis. Stat. § 995.15(9)(a), (b). Businesses that sell ENDS products not listed in the directory are subject to forfeiture penalties of $1,000 per day per product and seizure of the unauthorized products as "contraband." Wis. Stat. §§ 995.15(9)(a)-(b), (11)(a). Retailers, distributors, and manufacturers who sell electronic vaping devices that are not listed in the directory are considered to have engaged in an unfair and deceptive trade practice. Wis. Stat. § 995.15(9)(c). This subjects these businesses to potential injunction orders to stop

---

[4] Copies of documentation issued by and/or submitted to the FDA must be included with the manufacturer's initial and annual certifications. Wis. Stat. § 995.15(4).

selling such products from the Wisconsin Department of Agriculture, Trade, and Consumer Protection and allows competitors to bring civil actions against them and potentially recover awards of double damages and attorneys' fees. Wis. Stat. § 100.20(2)-(4), (5). Violations of such injunction orders are also punishable by civil penalties of up to $10,000 for each violation. Wis. Stat. § 100.26(6).

Plaintiffs' Complaint contends that section 995.15 conflicts with, and is preempted by, the exclusive discretion Congress granted the FDA in 21 U.S.C. § 337(a) to enforce (or not) the premarket authorization requirements established in 21 U.S.C. § 387j. Compl., ¶¶ 9, 76-80.

Defendant argues that the TCA's preservation and savings clauses found at 21 U.S.C. § 387p(1) and (2)(b) allow Wisconsin to enforce Section 995.15 without conflicting with the FDA's exclusive authority to enforce provisions of the FDCA. However, as explained herein, the text, structure, purpose, and history of the FDCA and the TCA demonstrate that such an outcome— which would eviscerate 21 U.S.C. § 337(a) as respects tobacco products—is contrary to Congress's intent. Thus, the Court should deny Defendant's motion as to Count I of the Complaint. Likewise, the Court should deny Defendant's motion as to Count II of the Complaint because, when viewed in light of the proper standard of review at this stage of case, Count II states a plausible claim for violation of the Equal Protection Clause.

### STANDARD OF REVIEW

"Motions to dismiss under Rule 12(b)(1) are meant to test the sufficiency of the complaint, not to decide the merits of the case. In the context of a motion to dismiss for lack of subject matter jurisdiction, [the court] accept[s] as true the well pleaded factual allegations, drawing all reasonable inferences in favor of the plaintiff." *Center for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014) (internal citations and quotations omitted); *see also Iddir v. INS*, 301 F.3d 492, 496 (7th Cir. 2002). "A standing challenge under Rule 12(b)(1)

typically 'can take the form of a facial or a factual attack on the plaintiff's allegations.'" *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1001, 1007 (7th Cir. 2021) (quoting *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020)). "A facial attack 'tests whether the allegations, taken as true, support an inference that the elements of standing exist,' and a factual attack 'test[s] the existence of jurisdictional facts underlying the allegations.'" *Id.* Facial attacks, such as the one brought by Defendant here, "require only that the court look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3 440, 443 (7th Cir. 2009) (emphasis omitted).

Similarly, "[a] motion to dismiss under federal Rule of Civil Procedure 12(b)(6) is designed to test whether a complaint is legally sufficient, and will only be granted if no relief is available under any set of facts consistent with the complaint." *Status Solutions, LLC v. JNL Techs., Inc.*, No. 20-cv-01119-wmc, 2021 U.S. Dist. LEXIS 127205, *4 (W.D. Wisc. July 8, 2021). "[A] 12(b)(6) motion requires the court to accept as true all well-pleaded facts in the complaint, drawing all reasonable inferences in favor of the opposing party." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). "To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts to 'state a claim that is plausible on its face.' A claim is plausible where a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## **ARGUMENT**

### A.    **Plaintiffs Have Article III Standing.**

Contrary to Defendant's contentions, Plaintiffs have Article III standing. Defendant's standing argument is premised entirely on the Supreme Court description in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), of an "injury in fact" as "an invasion of a legally protected interest,"

*id.* at 560. From that premise, Defendant argues that Plaintiffs cannot have standing because "unauthorized vapor product[s]" are illegal under the FDCA. ECF No. 35 at 12. Defendant reasons that because "drug smugglers" lack standing to challenge a criminal statute affecting their sale or possession of illegal drugs, sellers and users of unauthorized ENDS similarly lack standing to challenge section 995.15. *Id.* Defendant's arguments are incorrect for at least six reasons.

*First*, Defendant misreads *Lujan*. Explaining *Lujan*, Judge Posner, sitting by designation, explained: "[i]t is difficult to take *Lujan*'s formulation at face value. An injury 'in fact' is not, as the quoted statement implies, the same thing as the invasion of a legally protected interest." *Depuy, Inc. v. Zimmer Holdings, Inc.*, 384 F. Supp. 2d 1237, 1240 (N.D. Ill. 2005). Rather, "[p]robably all the [*Lujan*] Court meant was just that not any old injury can satisfy Article III—after all, there is a sense in which I am 'injured' when I become upset by reading about the damage caused that fine old vineyard in Burgandy by an band of marauding teetotalers, yet that injury would not be an injury to the kind of personal interest that I need to support an invocation of the federal judicial power created by Article III." Judge Posner again addressed this distinction from the Seventh Circuit bench in *Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018 (7th Cir. 2006). "The point," he clarified, "is not that to establish standing a plaintiff must establish that a right of his has been infringed; that would conflate the issue of standing with the merits of the suit." *Id.* at 1024. "It is that he must have a have a colorable *claim* to such right." *Id.* (emphasis in original).

Other circuit courts concur with Judge Posner: "[w]hen the Supreme Court used the phrase 'legally protected interest' as an element of injury-in-fact, it made clear it was referring only to a 'cognizable interest.'" *ABF Freight Sys. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 959 (8th Cir. 2011) (quoting *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008)). "When the *Lujan* Court used the phrase

11

'legally protected interest,' … the Court did not mean to suggest a return to the old 'legal right' theory of standing rejected in *Association of Data Processing Service Organizations Inc. v. Camp*, 397 U.S. 150, 153-54 (1970)." *Christian County Clerk v. Mortgage Elec. Registration Sys.*, 515 Fed. Appx. 451, 454 (6th Cir. 2013) (internal quotations omitted). "As the Supreme Court clarified in *Data Processing*, a plaintiff need not have a 'legal right' or a right protected by the law of property, contract, tort, or statute, to suffer injury-in-fact." *Id.*

The "judicially cognizable interest" requirement means only that for "a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, [he] cannot be a mere bystander but instead must have a 'personal stake' in the dispute." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 379 (2024); *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) ("To invoke the federal judicial power, a plaintiff must have standing—a personal stake in the case.") (internal quotations omitted).

Here, Plaintiffs have a personal stake in the dispute over whether section 995.15 violates the Constitution's Supremacy Clause and the Fourteenth Amendment's Equal Protection Clause; they thus have Article III standing.

*Second*, contrary to Defendant's contentions, sellers of unauthorized ENDS are not analogous to persons who sell illegal narcotics. The drug smuggler example does not apply where, as here, the FDA is exercising its enforcement discretion. Because "flexibility is a critical component of the statutory and regulatory authority under which the FDA pursues difficult (and often competing) objectives," *Buckman Co.*, 531 U.S. at 349, the FDCA's "enforcement provisions . . . commit complete discretion to [the FDA] to decide how and when they should be exercised," *Heckler*, 470 U.S. at 835 (emphasis added). For public health reasons, the FDA often chooses to exercise that discretion by not enforcing certain FDCA requirements.

For example, because of supply shortages of infant formula, the FDA has exercised enforcement discretion over formulas that do not meet all FDCA requirements.[5] As another example, the FDA has allowed some unapproved drugs to remain on the market because the drugs pose a low safety risk and are medically necessary for some patients.[6] Many of those unapproved drugs are commonly prescribed by doctors and available at most pharmacies.[7] And as Plaintiffs' Complaint explains, the FDA has had several formal enforcement discretion policies with respect to unauthorized ENDS over the past nine years based on the agency's efforts to balance the benefits of the products to adult smokers against the risks of the products to youth. Compl., ¶¶ 53, 54, and Exhibit B, ECF No. 1-4.

If Defendant's proposed interpretation of *Lujan*'s "legally protected interest" language applied, as here, to a situation in which a plaintiff sold a product for which the FDA was exercising enforcement discretion for public health reasons, that interpretation would lead to absurd results.

---

[5] *See* FDA, *Infant Formula Enforcement Discretion Policy: Guidance for Industry* at 3 (May 2022), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-infant-formula-enforcement-discretion-policy (stating that due to a shortage of infant formula, "FDA intends to temporarily exercise enforcement discretion with respect to certain requirements for infant formulas that may not comply with certain statutory and regulatory requirements").

[6] *See* FDA, *Termination of the FDA's Unapproved New Drugs Initiative; Withdrawal*, 86 Fed. Reg. 28605, 28606 (May 27, 2021) (stating that one of the goals of FDA's "risk-based approach" to unapproved drugs is to "preserv[e] patient access to medically necessary drugs").

[7] *See* R. Gupta, et al., *The FDA Unapproved Drugs Initiative: An Observational Study of the Consequences for Drug Prices and Shortages in the United States*, 23 Journal of Managed Care and Specialty Pharmacy, 1066, 1067 (Oct. 2017) ("The FDA estimated that approximately 2% of all prescriptions dispensed in the United States in 2006 may have been for products lacking FDA approval."); FDA, *Homeopathic Drug Products; Guidance for FDA Staff and Industry* 1 (Dec. 2022), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/homeopathic-drug-products-guidance-fda-staff-and-industry (stating "[t]he Agency anticipates that many homeopathic drug products will fall outside the categories of drug products that FDA intends to prioritize for enforcement and regulatory action").

13

For example, a plaintiff who manufactures a product over which the FDA is exercising enforcement discretion could not obtain relief in an Article III court from a defendant who causes injury to the plaintiff with respect to that product. Thus, to use the infant formula example, a plaintiff who manufactures infant formula under the FDA's exercise of enforcement discretion would not be able to sue a grocery store for breaching a contract to purchase that formula. The grocery store could simply argue that the manufacturer has no Article III standing for its breach of contract claim because the infant formula does not fully comply with FDCA requirements. The language that Defendant quotes from *Lujan* does not support such an absurd result.

*Third*, as the court noted in *Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue*, __ F. Supp. 3d ___, No. 4:24-cv-00448-SMR-HCA, 2025 U.S. Dist. LEXIS 85732 (S.D. Iowa May 2, 2025) ("*IFAST*"), "[a] rule that denies standing to Plaintiffs based solely on imperfect compliance with federal law would create an anomalous result: states could evade preemption challenges by simply asserting a plaintiff's noncompliance with the very federal standards at issue. Such circularity finds no support in our federalist structure." *Id*. at *19-20; *accord Vapor Tech. Ass'n v. Wooten*, No. 4:25-cv-00076-M-RJ, 2025 U.S. Dist. LEXIS 123020, *8-9 (E.D.N.C. June 27, 2025) (citing approvingly to *IFAST* and concluding that because "[t]he standing doctrine does not presume upon the merits a party's claim," the plaintiffs there had Article III standing). Indeed, where a plaintiff is the target of a state law that is preempted by federal law, the plaintiff has standing to challenge the state law even if the plaintiff's conduct violates federal law. *See United States v. Iowa*, 737 F. Supp. 3d 725, 744-45 (S.D. Iowa 2024) (indicating that unlawfully present immigrant had standing to challenge a state immigration statute as preempted by federal law), *aff'd*, 126 F.4th 1334 (8th Cir. Jan. 24, 2025), then vacated under *United States v.*

*Munsingwear*, 340 U.S. 36 (1950), No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025); *Farmworker Ass'n of Fla. v. Moody*, 734 F. Supp. 3d 1311, 1323, 1328 (S.D. Fla. 2024) (same).

<u>Fourth</u>, even if Defendant's standing argument were correct as to the retailer Plaintiffs (which it is not), the argument would still be incorrect as to the consumer Plaintiffs. Federal law prohibits the mere possession of controlled substances, including marijuana. 21 U.S.C. § 844(a); 21 C.F.R. § 1308.11(d)(23). But the FDCA does not prohibit the mere possession (or use) of unauthorized ENDS; it prohibits only the distribution of unauthorized ENDS in interstate commerce. 21 U.S.C. § 331(a)-(c). So, the consumer Plaintiffs, Kurt Wylie and Germaine Carmody, have standing independently of whether the retailer Plaintiffs have standing. And "the presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

<u>Fifth</u>, as testimony provided in support of Plaintiffs' motion for preliminary injunction has shown, the business Plaintiffs' injuries are not limited to lost revenues and profits from sales of unauthorized ENDS products. Enforcement of section 995.15's restrictions will force Plaintiffs Johnny Vapes, The Supply Plus, and Nara Smoke to close their stores (and may force Plaintiff Distro Guys to close its distribution business), so they will also suffer lost revenues and profits from sales of other products, including FDA-authorized ENDS, premium cigars, and other products not subject to FDA regulation. *See* ECF No. 19 at ¶ 13, ECF No. 20 at ¶¶ 7, 10, ECF No. 21 at ¶¶ 10, 11. Such injuries are sufficient to establish Article III standing. *See Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 975 F.2d 1267, 1274 (7th Cir. 1992) (observing that "economic injury, though indirect, is sufficient to confer standing"); *Lac Du Flambeau Band v. Norton*, 422 F.3d 490, 492 (7th Cir. 2005) (finding that standing is satisfied when "economic injury resulting

from [government actions] alter[s] competitive conditions). This is the case even if the dollar amount of that injury is relatively small. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

*Sixth*, as a practical matter, if section 995.15 were not enjoined and Plaintiffs were subject to a penalty proceeding as a result, there is no doubt that they could raise federal preemption as a defense. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("Ordinarily federal pre-emption is raised as a defense . . . ."). It thus stands to reason that Plaintiffs should have Article III standing to anticipatorily challenge the statute. *See Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158 (2014) (when subject to a threat of enforcement, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law").

Plaintiffs satisfy the "injury-in-fact" requirement for Article III standing.

**B.    Plaintiffs Have Alleged Sufficient Facts to State a Plausible Claim for Implied Preemption.[8]**

In Defendant's motion to dismiss Plaintiffs' claim that section 995.15 violates the Supremacy Clause, Defendant fails to identify any deficiencies in Plaintiffs' well-pleaded complaint. Rather, Defendant argues that Plaintiffs have no cause of action because section 995.15 is not preempted by 21 U.S.C. § 337(a).

As noted above, 21 U.S.C. § 337(a) provides that all "proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." Defendant contends that section 995.15 is not impliedly preempted because the TCA's specific preservation and savings clauses, 21 U.S.C. § 387p(a)(1) and (a)(2)(B), allow the state to enforce the directory

---

[8] While Plaintiffs have attempted to address Defendants' myriad arguments related to Count I herein, given the extensive previous briefing on the implied preemption issue in relation to Plaintiffs' motion for preliminary injunction, in the interest of completeness, Plaintiffs incorporate by reference that briefing as well. *See* ECF Nos. 16, 47, and 70.

restrictions as a "measure relating to or prohibiting the sale . . . of tobacco products by individuals of any age" (§ 387p(a)(1)) or as a "requirement[] relating to the sale . . . of tobacco products by individuals of any age" (§ 387p(a)(2)(B)).

If correct, Defendant's argument would effectively eviscerate section 337(a) with respect to tobacco products. However, the text, structure, purpose, and legislative history of the FDCA and the TCA demonstrate that Defendant's interpretation is wrong; Congress did not intend section 387p to eviscerate the applicability of section 337(a) to tobacco products. Rather, if (i) a restriction that a state qualifies as a "sales" restriction under § 387p compels partial or full compliance with some other provision of the TCA; and (ii) that compelled compliance generates a conflict with FDA's efforts to strike a balance between competing Congressional objectives in enacting the TCA, that state restriction is preempted by section 337(a). That is exactly the situation presented by Section 995.15.

We start with a discussion of the evidence from the text, structure, and legislative history of the TCA that, notwithstanding its enactment of section 387p's preservation and savings clauses, Congress intended section 337(a) to apply to tobacco product restrictions where an FDCA provision was a "critical element" of the restriction. We then explain why Defendant's reading of states' authority to enact "sales" restrictions under section 387p's preservation and saving clauses is overbroad, discuss how Section 995.15 actually conflicts with the FDA's discretion to take or refrain from taking enforcement action in furtherance of Congress's competing purposes in enacting the TCA, and then conclude with a short discussion of the operation of the TCA's express preemption clause. As the discussion illustrates, Plaintiffs plead a plausible claim that Section 995.15 is preempted.

1.    **The text and structure of the FDCA, including the Act's tobacco provisions, show that Congress intended section 337(a) to apply to tobacco products.**

"[I]n every preemption case," Congress' intent is "the ultimate touchstone." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "[E]vidence of pre-emptive purpose,' whether express or implied, must . . . be 'sought in the text and structure of the statute at issue.'" *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)); *accord Mach Mining, LLC v. Sec'y of Labor*, 728 F.3d 643, 651 n.13 (7th Cir. 2013) ("In determining Congress's intent [the Seventh Circuit] look[s] to 'the statute's language, structure, and purpose, [and] its legislative history.'") (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)); *Eli Lilly & Co. v. United States HHS*, No. 1:21-cv-00081-SEB-MJD, 2021 U.S. Dist. LEXIS 209257, at *57 (S.D. Ind. Oct. 29, 2021) (stating that, in interpreting statutes, courts are instructed to "interpret the relevant words, not in vacuum, but with reference to the statutory context, structure, history, and purpose.") (quoting *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014)). And courts must "construe statutes in the context of the entire statutory scheme and avoid rendering statutory provisions ambiguous, extraneous, or redundant." *Gillespie v. Equifax Info. Servs., L.L.C.*, 484 F.3d 938, 941 (7th Cir. 2007) (cleaned up).

Section 337(a) has been part of the FDCA since Congress enacted the Act in 1938. *See* 52 Stat. 1040, 1046 (1938). Section 337(a) is found in Chapter III of the FDCA (codified as subchapter III of chapter 9 of title 21 of the United States Code), which is titled "Prohibited Acts and Penalties." Other provisions in Chapter III prohibit the interstate distribution of any "food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded," 21 U.S.C. § 331(a), and provide mechanisms for the FDA to enforce that prohibition, 21 U.S.C. §§ 332-334. The FDCA's product-category-specific requirements, including the definitions of "adulterated" and "misbranded" as those terms are applied to categories of products, are located in Chapters IV, V,

VI of the FDCA. *See, e.g.*, 52 Stat. at 1046 ("Chapter IV—Food"); 1049 ("Chapter V—Drugs and Devices"); *id*. at 1054 ("Chapter VI—Cosmetics"); *see also* 21 U.S.C. § 387b (adulteration provision for tobacco products).

As originally enacted in 1938, the FDCA did not include any savings or express preemption clauses. But because the FDCA's subsequently enacted savings and express preemption clauses are product-category-specific, Congress has typically placed them in the FDCA chapter dedicated to that product category. *See, e.g.*, 21 U.S.C. § 346a(n)(8) (savings clause regarding food; located in Chapter IV); 21 U.S.C. § 350e(e) (preemption clause regarding food; located in Chapter IV); 21 U.S.C. § 350g(*l*)(6) (savings clause regarding food; located in Chapter IV); 21 U.S.C. § 360k(a) (preemption clause regarding medical devices; located in Chapter V); 21 U.S.C. § 364j (preemption and savings clauses regarding cosmetics; located in Chapter VI). Significantly, no court has ever held that any of the FDCA's savings or express preemption clauses for food, drugs, medical devices, or cosmetics limits the scope of section 337(a)'s prohibition on parties other than the federal government enforcing the FDCA.[9]

Indeed, Congress has recognized that because of the FDCA's structure, any statutory limitation on the scope of section 337 must come through an amendment to section 337, not through an amendment to provisions in one of the product-category-specific chapters of the FDCA. In 1990, Congress amended the FDCA through the Nutrition Labeling and Education Act ("NLEA"). Pub. L. 101-535, 104 Stat. 2353 (1990). The NLEA expanded the FDA's authority over food labeling by revising various provisions within Chapter IV of the Act, but simultaneously

---

[9] Because, unlike section 995.15, none of the state or local flavor bans in the four circuit court cases interpreting section 387p discussed by Plaintiff implicated enforcement of any provision of the FDCA or TCA, they are irrelevant to the applicability of section 337(a) here. *See* ECF No. 35 at 20-21. See also ECF No. 47 at 14-15, which discussion Plaintiff incorporates by reference herein.

enacted a new subsection (b) of section 337 that allows States to bring proceedings to enforce and restrain violations of certain food-related provisions of the FDCA. *See* 104 Stat. at 2362 (creating 21 U.S.C. § 337(b)).

Congress's decision to limit the scope of section 337 by amending 337 makes sense. After all, people reading section 337 should not be expected to read every other provision of the FDCA, including provisions in other chapters of the FDCA, to find out whether Congress has limited the scope of section 337(a). Unlike with food products, Congress never enacted a new subsection of section 337 that exempted tobacco products from the operation of section 337(a). The text and structure of the FDCA thus reflect Congress's intent for section 337(a) to apply to tobacco products even after Congress adopted section 387p as part of the Tobacco Control Act.

Consideration of other preemption provisions found in the FDCA reinforces the conclusion that Congress intended section 337(a) to apply to tobacco product requirements. In describing state requirements that are expressly preempted in several other provisions, Congress repeatedly used the formulation ". . . different from, in addition to, or *otherwise not identical to* . . ." the FDCA's requirements. *See* 21 U.S.C. §§ 364j(a), 379aa(h)(1), 379aa-1(h)(1), and 379s(a) (emphasis added). However, the TCA's express preemption provision, 21 U.S.C. § 387p(a)(2)(A), does not include the term "otherwise not identical to." Congress's omission of that language reflects Congress's intent to impliedly preempt under section 337(a) state law requirements that compel compliance with the TCA's requirements because they incorporate the TCA's requirements by reference.

**2. Based on pre-TCA case law, Congress understood section 337(a) could impliedly preempt state law claims if the "existence of" the TCA was a "critical element" of those claims.**

Courts must "assume that Congress is aware of existing [case] law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979)). So, courts must assume that Congress was aware of case

law interpreting the FDCA—including *Buckman* and its progeny—when it passed the TCA in 2009.

Buckman involved plaintiffs who alleged that they suffered personal injuries from defectively designed medical devices (orthopedic bone screws). The plaintiffs brought state law claims that were based on the theory that defendants obtained FDA clearance of the devices through false representations to the FDA. *Buckman,* 531 U.S. at 343. According to the plaintiffs, had those "representations not been made, the FDA would not have approved the devices, and plaintiffs would not have been injured." *Id.*

The Court held that section 337(a) impliedly preempted the plaintiffs' state law claims because "the existence of [the FDCA] was a critical element" of the defendants' purported state law duties. *Buckman*, 531 U.S. at 353. The Court reasoned that such "claims inevitably conflict with the FDA's responsibility" to enforce the FDCA "consistently with the [Agency's] judgment and objectives." *Id.* at 350; *accord Nathan Kimmel v. DowElanco,* 275 F.3d 1199, 1206 (9th Cir. 2002) (stating that the "key factor identified by the Supreme Court in concluding that Buckman's claims were pre-empted was that 'the existence of [the FDCA was] a critical element in [the] case'"). Therefore, when Congress passed the TCA in 2009, it knew that section 337(a) could impliedly preempt any state law if the existence of the TCA was a critical element of a person's duties under that state law. Had Congress wanted to avoid implied preemption of state law duties or claims that depended on the existence of the TCA, it would have amended 337.

And *Buckman* is applicable to the TCA notwithstanding the TCA's preservation, express preemption, and savings clauses. The *Buckman* plaintiffs argued that there should be no finding of implied conflict preemption under section 337(a) because the FDCA included an express preemption provision for medical devices. *Buckman*, 531 U.S. at 863. That express preemption

provision preempts any State law requirement "(1) which is different from, or in addition to, any requirement applicable under [the FDCA] to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under [the FDCA]." But the Court rejected the plaintiffs' argument because "neither an express preemption provision nor a savings clause 'bars the ordinary working of conflict preemption principles.'"). *Buckman*, 531 U.S. at 863-864 (quoting *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000)).[10]

> **3.** **In enacting the TCA, Congress did not intend section 387p's preservation and savings clauses to insulate state sales restrictions that compel compliance with other provisions of the TCA from implied preemption under section 337(a).**

The text, legislative history of the TCA, and the practical effect of section 387p's preservation and savings clauses demonstrate that Congress did not intend those clauses to insulate state sales restrictions that compel compliance with other provisions of the TCA from implied preemption under section 337(a).

> **a.** **The plain language of section 387p suggests that Congress did not intend it to limit the applicability of section 337(a).**

The plain language of section 387p's preservation clause demonstrates that Congress did not intend section 387p to limit the applicability of section 337(a). As codified in the United States Code, section 387p(a)(1) states: "Except as provided in paragraph (2)(A), nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority of

---

[10] "Conflict preemption" includes "implied preemption." *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) ("We have found implied conflict pre-emption where . . . state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'") (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *Petr v. BMO Harris Bank N.A.*, 95 F.4th 1090, 1102 (7th Cir. 2024) ("Conflict preemption applies to cases where . . . the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

. . . a State . . . ."  The "subchapter" referenced in subsection (a)(1) is subchapter IX of the FDCA, the TCA's provisions relating to FDA's regulation of tobacco products. As codified in the United States Code, section 337(a) is found in subchapter III of the FDCA.  If Congress had intended section 387p to limit the implied preemptive effect of section 337(a), it would not have referenced only the subchapter referencing the FDCA's tobacco provisions, but rather "Food, Drug, and Cosmetic Act" or "Act" to refer to the entirety of the FDCA or some other language to explicitly encompass section 337(a) in subchapter III. *See, e.g.*, 21 U.S.C. § 346a ("Nothing in this Act preempts the authority of any State or political subdivision to require that a food containing a pesticide chemical residue . . . .") (emphasis added); 21 U.S.C. § 387a-1(a)(1)(A) (providing for the issuance of a final rule "under . . . the Federal Food, Drug, and Cosmetic Act"). The fact that Congress did not do so reflects Congress's intent for section 337(a) to apply equally to the TCA's requirements as to any other provision of the FDCA.

This conclusion is reinforced by cases addressing an express preemption provision similar to that found in section 387p. The TCA's express preemption provision, 21 U.S.C. § 387p(a)(2)(A), is modeled on the FDCA's express preemption provision for medical devices. See 21 U.S.C. § 360(k) (preempting any State or local requirement "which is different from, or in addition to, any requirement applicable under this Act to the device").  And federal "courts have generally agreed that" a state law claim survives preemption under section 360k only if it "is premised on conduct that both (1) violates the FDCA, and (2) would give rise to recovery under state law even in the absence of the FDCA." *Scanlon v. Medtronic Sofamor Danek USA, Inc.*, 61 F. Supp. 3d 403, 411 (D. Del. 2014) (collecting cases) (emphasis added). Just as with section 360k, under 21 U.S.C. § 387p(a)(2)(A), a state law requirement that merely piggybacks on a TCA requirement is impliedly preempted. To avoid preemption, the state law requirement must be based on an identical

23

requirement that independently exists under state statute or common law. Here, section 995.15 does not satisfy this test because it explicitly piggybacks on a provision of the TCA—21 U.S.C. § 387j. Section 995.15's directory-related requirements would be meaningless in the absence of the FDCA.

> **b.    The TCA's legislative history suggests Congress did not intend section 387p's preservation and saving clauses to nullify section 337(a) with respect to tobacco products.**

The legislative history of the TCA indicates that Congress did <u>not</u> intend the TCA's preservation clause to limit the scope of section 337(a). When Congress was considering the TCA, several members of Congress introduced an amendment that would have created a separate statutory scheme outside of the FDCA (including an agency outside of FDA) to regulate tobacco products. *See* H.R. Rep. No. 111-58, pt. 1, at 6 (Mar. 2009). That separate statutory scheme—the Youth Prevention and Tobacco Harm Reduction Act (the "THR Act")—included a provision substantively identical to 21 U.S.C. § 337(a) and a preservation clause identical to the one in the TCA. *See* H.R. 1261, THR Act § 104 ("All proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the name of the United States."), THR Act § 119 ("Preservation of State and Local Authority") (Mar. 3, 2009).

The authors of the THR Act understood that their proposed legislation's preservation clause (section 119) did not nullify their proposed legislation's 337(a)-like provision (section 104). That understanding makes sense because one provision of an act cannot be read as implicitly nullifying another provision of that act. *See*, *e.g.*, *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 510 n.22 (1986) ("It is an elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.") (internal quotation and citation omitted); *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause

and word of a statute, . . . rather than to emasculate an entire section.") (internal quotations and citation omitted).

So, it stands to reason that Congress did not interpret the TCA's preservation and savings clauses—21 U.S.C. § 387p(a)(1) and (a)(2)(B)—to implicitly exclude tobacco products from the scope of section 337(a). Rather, Congress intended section 337(a) to impliedly preempt statutes enacted pursuant to a State's preserved powers if they generate a conflict with FDA's balancing of competing Congressional objectives in enacting the TCA.

### c. Defendant's interpretation of section 387p would allow a State to deputize itself or private parties to enforce any of the FDCA's tobacco provisions and render the express preemption provision of section 387p(a)(2)(A) a nullity.

As a practical matter, Defendant's interpretation would also impose no restrictions on a State's ability to deputize itself or private parties to enforce any of the FDCA's tobacco provisions, so long as those actions influence sales, thereby rendering the express preemption provision of section 387p(a)(2)(A) a nullity.

For example, the FDCA requires tobacco product manufacturing facilities to register with FDA, *see* 21 U.S.C. § 387e(b); and it authorizes the federal government, *and only the federal government*, to bring enforcement proceedings against anyone who sells a tobacco product manufactured in a non-FDA-registered facility.[11] But under Defendant's reading of section 387p, a State could enforce the section 387e(b) registration requirement through a "sales restriction" that prohibits the sale of tobacco products manufactured in non-FDA-registered facilities. As another

---

[11] The FDCA deems any tobacco product to be "misbranded" if it was manufactured in a non-FDA-registered facility, *see* 21 U.S.C. § 387c(a)(6); the FDCA prohibits the sale of any "misbranded" tobacco product, *see* 21 U.S.C. § 331(a); the FDCA authorizes civil and criminal enforcement proceedings for the sale of "misbranded" tobacco products, *see* 21 U.S.C. §§ 332, 333, 334; and the FDCA says that "all such proceedings" must be brought "in the name of the United States," *see* 21 U.S.C. § 337(a).

example, the FDCA requires the manufacturer or importer of certain tobacco products to pay a quarterly "user fee" to FDA, *see* 21 U.S.C. § 387s; and it authorizes the federal government, *and only the federal government*, to bring enforcement proceedings against anyone who sells a tobacco product manufactured or imported by someone who has not paid the required user fee. [12] But under Defendant's reading of section 387p, a State could enforce the section 387s user fee requirement through a "sales restriction" that prohibits the sale of tobacco products manufactured or imported by a person who did not pay the required user fee.

The situations discussed in the previous paragraph are no different from the situation here. The FDCA requires the manufacturer of any "new" tobacco product—including an ENDS product—to obtain FDA marketing authorization through the premarket tobacco product application process under 21 U.S.C. § 387j. Through section 337(a), the FDCA also authorizes the federal government, and only the federal government, to bring enforcement proceedings against anyone who sells a new tobacco product that does not have FDA marketing authorization. [13] But under Defendant's reading of section 387p, a State could enforce the section 387j premarket authorization requirement through a "sales restriction" that prohibits the sale of tobacco products that require, but lack, FDA marketing authorization or a pending application for the same.

In short, under Defendant's interpretation, there would be no limitations on what TCA requirements states could indirectly enforce as "sales" restrictions or requirements. And, because states could enforce any TCA requirement under the guise of a sales restriction or requirement, the

---

[12] The FDCA deems any tobacco product to be "adulterated" if it was manufactured or imported by someone who has not paid the required user fee," *see* 21 U.S.C. § 387b(4); the FDCA prohibits the sale of any "adulterated" tobacco product, *see* 21 U.S.C. § 331(a); and the FDCA authorizes civil and criminal enforcement proceedings for the sale of "adulterated" tobacco products, *see* 21 U.S.C. §§ 332, 333, 334.

[13] The FDCA deems any tobacco product to be "adulterated" if the product requires, but lacks, FDA premarket authorization, *see* 21 U.S.C. § 387b(6). *See also supra* n.12.

26

express preemption provision of Section 387p(a)(2)(A) that prohibits state requirements "different from, or in addition to, any requirement under [the TCA] relating to tobacco products standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products" would be rendered a nullity. Such an interpretation is to be avoided. *See Gillespie*, 484 F.3d at 941 ("We must . . . avoid rendering statutory provisions ambiguous, extraneous, or redundant.") (cleaned up).

> **4.    Section 995.15 conflicts with the FDA's discretion to take or refrain from taking enforcement action in furtherance of Congress's competing purposes in enacting the TCA.**

Defendant's arguments also ignore the very real conflict that Section 995.15 creates with the FDA's exclusive enforcement authority under 21 U.S.C § 337(a), and the discretion with which Congress entrusted the FDA to enforce 21 U.S.C. 387j. To agree with Defendant's interpretation, this Court would have to believe that Congress intended 21 U.S.C. § 387p's preservation and savings clauses to impede basic principles of conflict preemption even where actual conflict between the state and federal government's approaches exists. That is an illogical conclusion, and this Court should not accept it. *See, e.g.*, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 976 (7th Cir. 2004) ("We interpret statutes to avoid absurd results.") (citing *FutureSource L.L.C. v. Reuters Ltd.*, 312 F.3d 281, 284-85 (7th Cir. 2002) ("Nonsensical interpretations of contracts, as of statutes, are disfavored . . . not because of a judicial aversion to nonsense as such, but because people are unlikely to make contracts, or legislators statutes, that they believe will have absurd consequences.")).

"The ordinary principles of preemption include the well-settled proposition that a state law is preempted where it 'stands as an obstacle to the accomplishment and execution of the full

27

purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 406 (2012) (quoting *Hines*, 312 U.S. at 67 (2002)). And as the Supreme Court has repeatedly declared, a savings clause "does *not* bar the ordinary working of conflict pre-emption principles." *Geier*, 529 U.S. at 869; *cf.* 73 Fed. Reg. 49603, 49605 (Aug. 22, 2008) ("FDA does not believe that the absence of an express preemption provision with respect to drugs affects the application of the doctrine of implied preemption."). When state law permits "actions that 'actually' conflict' with federal regulations, it would take from those who would enforce a federal law the very ability to achieve the law's congressionally mandated objectives that the Constitution, through the operation of ordinary preemption principles, seeks to protect." *Geier*, 529 U.S. at 872. "To the extent that such an interpretation of the savings provision reads into a particular federal law toleration of a conflict that those principles would otherwise forbid, it permits that law to defeat its own objectives, or potentially, as the [Supreme] Court has put it before, to 'destroy itself.'" *Id.* (quoting *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 228 (1998)).

When Congress enacted the TCA, it charged the FDA with reducing serious tobacco-related disease and death, which is primarily caused by traditional, combustible cigarettes. *See* TCA, § 3(9), 123 Stat. at 1782 (stating that one of the purposes of the TCA is "to promote cessation to reduce disease risk and the social costs associated with tobacco-related diseases"). One of the ways Congress identified to reduce such disease and death was to give FDA "new and *flexible* enforcement authority" over "less harmful tobacco products." TCA, § 3(4), 123 Stat. at 1782 (emphasis added).

Since ENDS became subject to the FDA's regulatory authority in 2016, the FDA has continually communicated to the ENDS industry its policy of discretionary enforcement. This is because the FDA has recognized that removing most or all ENDS products from the market would

28

have negative health outcomes. In the FDA's own words, "[t]hrough enforcement [discretion] policies that FDA has revised over time, the agency has sought to strike a balance between the serious risk that e-cigarettes pose to youth and their potential benefit in helping adult smokers completely transition from or significantly reduce smoking combustible cigarettes." Compl., ¶ 53 and Exhibit B, ECF No. 1-4.

Congress entrusted the FDA with exclusive enforcement discretion to strike a balance between the risks and benefits to public health of allowing unauthorized ENDS products to remain on the market when few FDA-authorized ENDS have been available. By indirectly enforcing 21 U.S.C. § 387j, Section 995.15 directly conflicts with the FDA's considered and communicated policy of deferred enforcement and is therefore preempted. *See Nexus Pharms., Inc. v. Central Admixture Pharm. Serv., Inc.*, 48 F.4th 1040, 1048 (9th Cir. 2022) ("The statutory prohibition on private enforcement gives the FDA discretion to temper enforcement or not to enforce in circumstances it deems appropriate. If state law facilitates enforcement beyond what the FDA has deemed appropriate, then state law claims may indeed 'stand as an obstacle' to FDA's enforcement discretion."); *Farina v. Nokia, Inc.*, 625 F.3d 97, 123 (3d Cir. 2010) ("The Supreme Court's preemption case law indicates that regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption."); *cf. Sprietsma v. Mercury Marine*, 537 U.S. 51, 66-67 (2002) (noting that "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate.") (emphasis in original).

To read 21 U.S.C. § 387p to tolerate the conflict that Section 995.15 creates with the FDA's policy of deferred enforcement of 21 U.S.C. § 387j would permit the FDCA to defeat its own

objectives. It is antithetical to the principle of federal preemption that the existence of a savings provision would require the toleration of this conflict. *See Geier*, 529 U.S. at 871 ("Why . . . would Congress not have wanted ordinary pre-emption principles to apply where an actual conflict with a federal objective is at stake?"). For this fundamental reason, "[t]he [Supreme] Court has thus refused to read general 'saving' provisions to tolerate actual conflict *both* in cases involving impossibility . . . and in "frustration-of-purpose" cases[.]" *Id*. at 873-74.

Federal courts have repeatedly held that state laws that conflict with or create an obstacle to a federal agency's enforcement discretion are preempted. *See e.g.*, *Arizona*, 567 U.S. at 406 ("Although § 5(C) attempts to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involves a conflict in the method of enforcement. The [Supreme] Court has recognized that a '[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.'") (quoting *Motor Coach Employees* v. *Lockridge*, 403 U.S. 274, 287 (1971)); *United States v. Iowa*, 126 F.4th at 1347 ("Even accepting Iowa's interpretation, Section 2 is still an obstacle to the exercise of the discretion that Congress gives to federal officials charged with enforcing federal immigration law.") (collecting cases), *underlying decision later vacated under Munsingwear*, No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025).

Not only does section 995.15 conflict with the FDA's method of enforcement of the FDCA by deputizing the WDOR to indirectly enforce 21 U.S.C. § 387j against sellers of ENDS products that lack premarket authorization, but it also creates an avenue for competing private parties to sue sellers of ENDS products that lack marketing authorization for treble damages under Wisconsin's unfair and deceptive trade practices statutes. *See* Wis. Stat. § 100.20(2)-(5). The deceptive trade practice designation also potentially subjects sellers of unauthorized products to criminal

prosecution and civil penalties of up to $10,000 per violation. Wis. Stat. § 100.26(6). This goes far beyond the FDA's historical approach when it has determined that an ENDS product lacking marketing authorization should be removed from the market, which is to issue Warning Letters to "give individuals and firms an opportunity to take voluntary and prompt corrective action before [the FDA] initiates an enforcement action." *See* Food and Drug Administration Regulatory Procedures Manual, July 2024, Ch. 4 Advisory Actions, § 4-1-1, *available at* https://www.fda.gov/media/71878/download.

Congress tasked the FDA with reducing disease and death caused by traditional tobacco products, and in so doing the FDA made the "deliberate choice" to leave many unauthorized ENDS products on the market by deferring enforcement of 21 U.S.C. § 387j. *Arizona*, 567 U.S. at 405. The WDOR's indirect enforcement of the 21 U.S.C. § 387j through Section 995.15 is "inconsistent with federal policy and objectives." *Id*. The Supreme Court "has repeatedly 'declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'" *Geier*, 529 U.S. at 870 (quoting *U.S. v. Locke*, 529 U.S. 89, 106 (2000)). So, too, should this Court decline to read 21 U.S.C. § 387p to tolerate this conflict.

> **5.    Even examining section 387p in isolation, section 995.15 would be expressly preempted because it imposes premarket authorization requirements that are "different from" or "in addition to" those set forth in 21 U.S.C. §§ 387j and 387e(i).**

Even if one were to ignore section 337(a) and implied preemption in their entirety, the TCA's express preemption clause, section 387p(a)(2)(A), would still preempt section 995.15. This is the case because section 995.15 contains premarket review, adulteration, and registration requirements that are "different from" or "in addition to" those imposed by the TCA and, as explained above, adopting the State's overbroad interpretation of section 387p's savings clause would otherwise render section 387p(a)(2)(A)'s limitations on State authority a nullity.

31

Title 21 U.S.C. § 387j and 21 C.F.R. §§ 1114.1-1114.49 govern the FDA's premarket review process for ENDS products. As discussed above, under the FDCA, ENDS products that lack a marketing granted order are considered "adulterated" under 21 U.S.C. § 387b(6)(A) and their sale in interstate commerce is prohibited under 21 U.S.C. § 331(a)-(c). Moreover, manufacturers of tobacco products have an independent statutory obligation to register all tobacco products that they are manufacturing for commercial distribution under 21 U.S.C. § 387e(i). Failure to properly register a tobacco product similarly renders that product "adulterated" and prohibits its sale in interstate commerce. *See* 21 U.S.C. § 331(p).

Section 995.15 imposes specific requirements related to premarket review, adulteration, and registration that are not found in these provisions of the TCA or FDA's associated regulations. For example, to be included in WDOR's directory, in addition to submitting a PMTA to FDA, a manufacturer must pay a yearly fee of $500 per product. Wis. Stat. § 995.15(3). The manufacturer must also certify that it agrees to comply with section 995.15's restrictions. Wis. Stat. § 995.15(2). Neither the FDCA nor FDA requires payment of any such fees or agreement to any such certification to submit a PMTA or obtain a marketing granted order from FDA. For these additional reasons, even without considering the effects of section 337(a), the express preemption language of 21 U.S.C. § 387p(a)(2)(A) would prohibit enforcement of Section 995.15.[14]

For each of these reasons, the text, structure, purpose, and legislative history of the FDCA and TCA require the conclusion that, because it depends upon the TCA's premarket authorization

---

[14] If the Court grants Defendant's motion in its entirety concerning Plaintiffs' claim for declaratory and injunctive relief based primarily on implied preemption, Plaintiffs seek leave to file a first amended complaint raising in part this express preemption conflict. *See Reilly v. Will Cnty. Sheriff's Off.*, 142 F.4th 924 (7th Cir. 2025) ("[A] plaintiff whose complaint has been dismissed at the pleading stage should be given at least one opportunity to amend." (citing *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) and Fed. R. Civ. P. 15(a) ("The court should freely grant leave when justice so requires.")).

provision, Section 995.15 is not a mere sales restriction that Wisconsin was privileged to enact under 21 U.S.C. § 387p(a)(1) or (a)(2)(B), but rather an effort to indirectly enforce 21 U.S.C. § 387j that is impliedly preempted under section 337.

### 6. Plaintiffs are not limited to raising implied preemption under section 337(a) as an affirmative defense in an enforcement action.

Finally, Defendant contends that Plaintiffs fail to plead a plausible implied preemption claim because they wield section 337(a) as an offensive sword, rather than as a defensive shield. ECF No. 35 at 24-26. This contention flies in the face of the underlying purpose of the Declaratory Judgment Act and at least one persuasive case from a federal circuit court.

The Declaratory Judgment Act, 28 U.S.C. § 2201, pursuant to which Plaintiffs assert their claims, ECF No. 1 at ¶¶ 22, 97, "provides the mechanism for seeking pre-enforcement review of a statute." *NRA of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). "To raise a constitutional challenge, the petitioner did not need to break the law and thereby expose himself to liability. Instead, he merely need[s] to show a genuine threat of enforcement." *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023).

"The 'declaratory judgment remedy is an all-purpose remedy designed to permit an adjudication whenever the court has jurisdiction, there is an actual case or controversy, and an adjudication would serve a useful purpose.'" *Minniecheske v. Vocke*, No. 89-1347, 1990 U.S. App. LEXIS 18436, *22 (7th Cir. Oct. 19, 1990) (quoting 6A Moore's Federal Practice para. 57.05 (2d ed. 1986)). In enacting the Declaratory Judgment Act, it "was [C]ongress['s] intent to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage had accrued." *E. Edelmann & Co. v. Triple-A Specialty Co.*, 88 F.2d 852, 854 (7th Cir. 1937). "The dilemma posed by [government] coercion—putting the challenger to the choice between abandoning his rights or

33

risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (quoting *Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 152 (1967)).

"[F]ederal declaratory relief is not precluded when . . . a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state . . . statute, whether an attack is made on the constitutionality of the statute on its face or as applied." *Steffel v. Thompson*, 415 U.S. 452, 475 (1974). When "the declaratory judgment will clarify and settle the disputed legal relationships and afford relief from the uncertainty and controversy that created the issues, it is usually resolved rather than dismissed." *Nucor Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 578 (7th Cir. 1994).

Here, Plaintiffs seek a declaratory judgment from the Court as to the constitutionality of section 995.15 specifically so that they are not required to violate section 995.15 and wait for the WDOR or a private competitor to file suit against them for civil penalties, damages, or attorneys' fees before their implied preemption defense can be adjudicated. Because such anticipatory adjudication is the very reason Congress enacted the Declaratory Judgment Act, the procedural posture of this case as opposed to many of the cases where courts have previously found implied preemption under section 337(a) is a distinction without a difference.

This point is exemplified by a recent decision from the Ninth Circuit. In *Grand River Enterprises Six Nations, Ltd. v. Knudsen*, No. 23-35494, 2024 U.S. App. LEXIS 14597 (9th Cir. June 14, 2024), the Montana Attorney General issued an order banning all in-state sales of the plaintiff's tobacco products and removing them from a Montana directory of tobacco products legally available for purchase because of claims that the plaintiff had sold tobacco products that were adulterated and misbranded under the FDCA, even though FDA had taken no enforcement

34

action against the plaintiff, *id.*, at *2-3. The plaintiff initiated a district court lawsuit in which it sought a preliminary injunction to prevent the Montana Attorney General from removing its products from the state directory and from ordering wholesalers in the state not to distribute the plaintiff's products. *Id.* at *3. After the district court denied the injunction, the Ninth Circuit reversed; citing *Buckman*, the court concluded that because the Montana Attorney General's action was predicated on the plaintiff's purported violation of the FDCA, that action was impliedly preempted by 21 U.S.C. § 337(a), and the plaintiff was likely to succeed on the merits of its implied preemption claim. *Id.* at *3-5. The court stated:

> Here, the Attorney General reasoned that the FDA's determination that the products were adulterated and misbranded made their continued sale in the State (1) a violation of federal law that (2) resulted in a violation of state law (via breach of the [Assurance of Voluntary Compliance]). In other words, the Attorney General's claim "exist[s] solely by virtue of the FDCA." *Id.* Because the Attorney General's conduct was an impermissible attempt to enforce the FDCA, [plaintiff] is likely to succeed on the merits of its preemption claim.

*Id.* at *5.

So, too, here. If the Court does not declare Section 995.15 impliedly preempted and enjoin its enforcement, just like the plaintiff in *Grand River Enterprises*, the business Plaintiffs here will be susceptible to claims by the State for monetary penalties, seizure of their inventories as contraband, and private lawsuits from competitors for having engaged in unfair trade practices— all because the products they sell do not partially or fully comply with the FDCA's premarket authorization requirements under 21 U.S.C. § 387j. The fact that Plaintiffs seek anticipatory declaratory and injunctive relief does not undermine the plausibility of their implied preemption claim. [15]

---

[15] Defendant also cites *Garcia v. Wyeth-August Laboratories*, 385 F.3d 961 (6th Cir. 2004), apparently for the proposition that implied preemption under Section 337(a) cannot be advanced as part of an offensive claim. But *Garcia* is inapposite; the exceptions to the Michigan drug product

Relatedly, Plaintiffs also claim that because section 995.15 "requires no determination of whether someone is violating a relevant provision of the TCA," it is not preempted by section 337(a). ECF No. 35 at 22. But this contention blinks past the practical operation of the statute. Because section 995.15 explicitly cross-references 21 U.S.C. § 387j, that provision of the FDCA is a "critical element" of the statute's operation. A manufacturer must, of necessity, be in either partial or full compliance with the TCA's premarket authorization requirements for its ENDS products to be eligible for listing on the directory. And, if a manufacturer is not, and continues to sell its unlisted ENDS products, that non-compliance with section 387j provides an indirect basis for enforcement by the State under section 995.15.

**C.    For these reasons, the fact that Plaintiffs invoke section 337(a) as part of their offensive claim for declaratory and injunctive relief provides no basis to conclude that section 995.15 is not impliedly preempted. Plaintiffs Have Alleged Sufficient Facts to State a Plausible Claim for a Violation of the Equal Protection Clause.**

Defendant engages in a standard rational basis analysis, providing potential post-hoc rationalizations to support his defense that Section 995.15's dissimilar treatment of tobacco-derived and non-tobacco-derived ENDS products is neither arbitrary nor irrational. ECF No. 35 at 33-35. While those arguments may be relevant to the merits of Plaintiffs' claim, they are neither appropriate nor dispositive in the context of a Rule 12(b)(6) motion to dismiss.

The Seventh Circuit has confronted the "perplexing situation [] presented when the rational basis standard meets the standard applied to a dismissal under Fed. R. Civ. P. 12(b)(6)." *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992). In *Wroblewski*, the Seventh Circuit noted:

> The rational basis standard requires the government to win if any set of facts reasonably may be conceived to justify its classification; the Rule 12(b)(6) standard requires the plaintiff to prevail if relief could be granted under any set of facts that

---

tort liability and immunity statute at issue there turned on whether FDA new drug approval was obtained through fraud. 385 F.3d at 964, 965. Nothing in section 995.15 relates to a potential claim of fraud on the FDA—only the manufacturer's full or partial compliance with 21 U.S.C. § 387j.

> could be proved consistent with the allegations. . . . The rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard. The latter standard is procedural, and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail on an equal protection claim.

965 F.2d at 459-60 (cleaned up). The Seventh Circuit resolved this predicament by concluding that a court "must take as true all of the complaint's allegations and reasonable inferences that follow [and] apply the resulting 'facts' in light of the deferential rational basis standard." *Id*. at 460. Therefore, "[t]o survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Id*.

Plaintiffs' Complaint alleges sufficient facts to overcome the presumption of rationality that applies to government classifications. For example, while Wisconsin has a legitimate interest in "protect[ing] public health, especially as to adolescents and young adults," ECF No. 35 at 33, Section 995.15's disparate treatment of non-tobacco-derived and tobacco-derived ENDS products is not only arbitrary but would also be illogical if that were the goal. First, regardless of the source, nicotine is a single chemical substance that has a set definition: 3-(1-Methyl-2-pyrrolidinyl) pyridine or $C_{10}H_{14}N_2$. *See* 21 U.S.C. § 387(12). Contrary to Defendant's claim, it simply is not the case that synthetically manufactured nicotine is a "newer and lesser known substance." ECF No. 35 at 33. Rather, it is *exactly the same substance* as tobacco-derived nicotine.[16] Second, as Plaintiffs allege in their complaint, "tobacco-derived nicotine is likely to contain a *higher* level of organic impurities than manufactured, non-tobacco-derived nicotine, yet, paradoxically, ENDS

---

[16] Indeed, the single chemical identity of nicotine, regardless of source, definitively rebuts Defendant's claim that sellers of ENDS products with synthetically manufactured nicotine are somehow not similarly situated to sellers of ENDS products with tobacco-derived nicotine. ECF No. 35 at 30-31.

products containing tobacco-derived nicotine are treated preferentially under Section 995.15." Compl. ¶ 92 (emphasis added). Third, notwithstanding Defendant's argument, nothing in the provisions of Section 995.15 that Plaintiffs challenge directly relates to sales or marketing of ENDS products to minors. Indeed, the FDCA already sets a nationwide minimum age for the purchase of tobacco products at 21 years old, 21 U.S.C. § 387f(d)(5), which supersedes a separate Wisconsin statute that sets the minimum age at 18, Wis. Stat. § 254.92(2).

Although Defendant floats potential post-hoc rationalizations for treating non-tobacco-derived and tobacco-derived nicotine ENDS products differently, these alleged justifications are irrelevant at this stage of the case; the facts under scrutiny in a Rule 12(b)(6) inquiry are those alleged in the Plaintiffs' Complaint, not the defenses alleged in Defendant's motion to dismiss that Complaint. *See Mary's House, Inc. v. North Carolina*, 976 F. Supp. 2d 691, 704 (M.D.N.C. 2013) ("While Defendants articulate a rational basis in their motion to dismiss . . . no evidence or allegation of a rational basis appears in the Complaint. The Complaint therefore alleges sufficient facts to 'overcome the presumption of rationality' at this early stage" (quoting *Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008))). Because the "[C]omplaint [does not] reveal a rational basis" for the disparate treatment, the "plaintiffs have [not] pleaded themselves out of court" and, therefore, the Complaint alleges sufficient facts to "overcome the presumption of rationality" at this early stage. *D.B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013). Accordingly, this Court should deny Defendant's motion to dismiss Plaintiff's equal protection claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendant's motion to dismiss in its entirety.

Dated: August 28, 2025

Kendall W. Harrison
State Bar No. 1023438
Jenna L. Riddle
State Bar No. 1129373
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
P.O. Box 2719
Madison, WI 53701-2719
Phone: 608-257-3911
Fax: 608-257-0609
kharrison@gklaw.com
jriddle@gklaw.com

By: _____s/ Eric N. Heyer_____
Eric N. Heyer
James C. Fraser
Joseph A. Smith
Anna Stressenger
Ryan D. Callinan
THOMPSON HINE LLP
1919 M Street, NW, Suite 700
Washington, DC 20036
T: (202) 331-8800
F: (202) 331-8330
Eric.Heyer@ThompsonHine.com
Joe.Smith@ThompsonHine.com
James.Fraser@ThompsonHine.com
Anna.Stressenger@ThompsonHine.com
Ryan.Callinan@ThompsonHine.com

*Counsel for Plaintiffs*