IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

Wisconsinites for Alternatives to
Smoking & Tobacco, Inc., et al.,

                                Plaintiffs,                          OPINION AND ORDER

        v.                                                               25-cv-552-wmc

David Casey,
Secretary of the Wisconsin Department
of Revenue, in his official capacity,
                                Defendant.

A coalition of manufacturers, distributors, retailers, and users of electronic nicotine delivery systems (known as "ENDS" or "e-cigarettes") filed this action against defendant David Casey, in his official capacity as Secretary of the Wisconsin Department of Revenue, seeking declaratory and injunctive relief barring enforcement of Wis. Stat. § 995.15. That statute prohibits the sale of all electronic vapor devices in Wisconsin unless already deemed compliant with federal regulations by the Federal Food, Drug, and Cosmetic Act ("FDCA"), a timely application is still pending FDA review, or the product contains hemp but no nicotine. Before the court is plaintiffs' motion for preliminary injunction (dkt. #15), arguing § 995.15 violates the Supremacy Clause of the United States Constitution because the FDCA impliedly preempts any state law that relies on its regulations to establish liability. For the reasons explained below, as well as briefs and supplemental briefs, affidavits and testimony provided at the hearing on August 1, 2025, plaintiffs' motion will

be denied.[1]

## BACKGROUND

**A. History of the FDCA and Tobacco Product Regulation**

The FDCA was enacted in 1938 and has long required the approval of the Food and Drug Administration ("FDA") before certain products could be introduced into the market. Pub. L. No. 75-717, 52 Stat. 1040 (1938). In 2009, the FDCA was amended by the Family Smoking Prevention and Tobacco Control Act ("TCA"), 123 Stat. 1776 (2009).[2] This extended the FDA's regulatory authority to "new tobacco products" and required them to have approval before being sold in the market. *Id*.[3] When first introduced, the FDA did not treat e-cigarettes as "new tobacco products"; however, the FDA changed course in 2016, declaring them subject to the provisions of the TCA. 81 Fed. Reg. 29028-29044 (2016). In 2022, Congress amended the TCA, further clarifying that "tobacco products" encompass nicotine from "any source," not just tobacco. Pub. L. No. 117-103, 136 Stat. 789 (2022) (codified at 21 U.S.C. § 321(rr)(1)).

For a company to receive FDA approval for a "new tobacco product," it must submit

---

[1] Defendant moved to strike plaintiffs' supplemental brief (dkt. #70), arguing that plaintiffs have raised new arguments and did not ask for this relief. (Dkt. #71.) Because defendant also exceeded this court's briefing orders and failed to show how he was prejudiced by plaintiffs' supplemental brief, however, his motion is DENIED and both sides' supplemental briefing have been considered by the court.

[2] The TCA also amended the Federal Cigarette Labeling and Advertising Act ("FCLAA"), 15 U,S, §§ 1331-1340, governing health warning labels and advertising for cigarettes, including an express preemption preventing states from regulating cigarette advertising. 15 U.S.C. § 1334.

[3] "New tobacco products" are any tobacco products that were not "commercially marketed in the United States as of February 15, 2007, and later modifications to tobacco products that were available as of that date. 21 U.S.C. § 387j(a)(1)

a premarket tobacco product application ("PMTA"). 21 C.F.R. § 1114.1(a). If the PMTA demonstrates that the product meets all applicable requirements, the FDA will issue a "marketing granted order." § 1114.5. "A new tobacco product may not be introduced or delivered for introduction into interstate commerce ... until the FDA has issued" a marketing authorization or similar order. *Id.* However, due to the size of the e-cigarette market at the time it became subject to the TCA, the FDA announced deferred enforcement of the TCA against manufacturers and retailers who met specific market and application deadlines. To date, only thirty-nine e-cigarette products have received the necessary market approval. *See* https://www.accessdata.fda.gov-scripts/searchtobacco/ (last visited August 8, 2025).

Initially, the FDA announced it would exercise discretion for unauthorized products until August 2019, so long as the product was on the market by August 8, 2016, and the manufacturer submitted a PMTA by August 9, 2018. Over the next few years, the enforcement discretion period changed several times. In 2020, the FDA announced its "final" extension, delaying enforcement until September 2021 for e-cigarettes products that had been on the market before August 8, 2016, and whose manufacturer had submitted a PMTA by September 9, 2020. Since the expiration of that order in September 2021, the FDA has made enforcement decisions regarding unauthorized e-cigarettes on a case-by-case basis. Since October 2019, the FDA has received PMTAs for 26,636,962 e-cigarettes products and, as of March 31, 2025, has made determinations on 26,139,873 products, leaving approximately 497,000 different e-cigarette product applications pending.

3

In 2023, the FDA considered a citizen petition from an R.J. Reynolds affiliate asking to exclude enforcement against e-cigarettes that were on the market by August 8, 2016, and had pending PMTAs submitted before September 9, 2020, which were still under review or were the subject of ongoing litigation against the FDA.[4]  However, the FDA and United Sates International Trade Commission did not adopt this policy.

### B. Wisconsin's Regulation of Electronic Vaping Devices

With the passage of Wis. Stat. § 995.15, on December 6, 2023, Wisconsin created its own regulatory framework directing the Wisconsin Department of Revenue ("DOR") to maintain a directory of all electronic vaping devices, including ENDS, that are eligible for sale in Wisconsin.  Wis. Stat. § 995.15(6).  Enforcement of Wis. Stat § 995.15 began on September 1, 2025.  *Id.*  To be placed on the directory, an ENDS manufacturer must annually certify to DOR that its product:  (1) "has received a marketing authorization or similar order for the electronic vaping device from the U.S. food and drug administration pursuant to 21 USC 387j"; (2) was on the market in the U.S. "as of August 8, 2016," an associated PMTA was submitted to the FDA "on or before September 9, 2020," and "either the application remains under review" by the FDA or "a final decision on the application has not otherwise taken effect"; or (3) "contains hemp … and does not contain nicotine."[5]  Further, manufacturers and retailers who sell vaping products in Wisconsin that are *not*

---

[4] This did not allow for any non-tobacco-derived nicotine ENDS because they were not subject to the FDCA until April 2022 and would not have needed to submit a PMTA prior to September 9, 2020.

[5] Wis. Stat. § 995.15(2).  Products containing hemp as defined by Wis. Stat. § 94.55(1), but not nicotine, are subject to enforcement beginning September 1, 2026.  Wis. Stat. § 995.15(2m).

listed on the directory are subject to fines and other civil penalties and have "engage[d] in an unfair and deceptive trade practice in violation of s. 100.20." Wis. Stat. § 995.15(9) and (10). In addition to administrative and judicial actions for injunctive or other relief brought the Wisconsin Department of Agriculture, Trade and Consumer Affairs or Wisconsin Department of Justice, "[a]ny person suffering a pecuniary loss because" of a violation of Wis. Stat. § 100.20 may commence a civil suit to recover twice that "loss, together with costs, including a reasonable attorney fee." Wis. Stat. § 100.20(3)-(6).

On June 30, 2025, almost 19 months after Wis. Stat. § 995.15 was signed into law, and two months before its enforcement was set to begin plaintiffs filed this action arguing that Wis. Stat. § 995.15 violates the Supremacy Clause of Article IV and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. On July 8, 2025, plaintiffs filed their motion for preliminary injunction, solely relying on their preemption theory. The motion was fully briefed and the court heard oral arguments on August 1, 2025, because Wisconsin's directory was not published until August 1, 2025, the court granted plaintiffs permission to submit supplemental declarations providing a more granular review of the harm they may suffer.

### C. Plaintiffs' Claimed Harm

Generally, the retail plaintiffs, some of whom were subjected to cross-examination during the court's preliminary injunction hearing, represent that if they are limited to selling the 190 products currently listed on the Wisconsin DOR directory, they will face a significant loss of business and revenues, likely causing them to downsize or completely close their businesses. Specifically, Visfot Inc., an ENDS retailer, opines it will lose over

80% of its revenue from previous years because less than 3% of its ENDS revenue, which accounts for approximately 83% of its total revenue, is currently on the directory. Without these products, it anticipates a reduction in its core business will also reduce sales of other products, such as snacks or apparel. Similarly, Johnny Vapes, an ENDS retailer, has product inventory over $200,000 that will no longer be subject for sale, neither does Vapes carry nor anticipate carrying any of the products currently listed in the directory that could lead to substantial sales. Further, Supply Plus, an ENDS retailer, anticipates that its revenue will decline by over 65% -- not accounting for the reduction in sales of non-vaping products that customers purchase when they visit their store -- and has an inventory of ineligible products currently valued at $155,000. Central City Vapes, an ENDS retailer, also attested that a shift to directory-approved products would likely cause a cessation in operations, because it would be competing directly with gas stations and convenience stores that receive significant discounts for reserving shelf space and selling traditional tobacco products.

In addition, Distro Guys, an ENDS wholesale distributor, represents that 85% of their sales came from disposable ENDS products not on the current version of Wisconsin's directory and only 9.5% of their revenue came from products on Wisconsin's directory. Moreover, Triton, a manufacturer of tobacco and non-tobacco-derived nicotine for use in refillable ENDS products, timely filed PMTAs for its non-tobacco-derived, nicotine products when they became subject to the FDCA in 2022. However, Under Wis. Stat. § 995.15, Triton also represents that all of its products would be banned from sale in Wisconsin until the FDA approves their applications. Finally, without access to specific

6

ENDS products not yet eligible for the directory, individual, retail customer plaintiffs represent that they are much more likely to revert to traditional combustible cigarettes, which would damage their health.

OPINION

Plaintiffs seek a preliminary injunction enjoining defendants from enforcing Wis. Stat. § 995.15.  Generally, a preliminary injunction is an extraordinary and drastic remedy, and it is never awarded as a matter of right. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Boucher v. Sch. Bd. of the Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998).  Thus, the moving party has the burden to show that it is likely to succeed on the merits and would suffer irreparable harm absent the injunction. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021).  If successful, the moving party must also show that granting an injunction weighs in the public interest.  *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  When balancing these equities, a moving party's delay in requesting a preliminary injunction further weighs against their request. *Benisek v. Lamone*, 585 U.S. 155, 160 (2018).

Here, plaintiffs argue that:  they are likely to succeed on their claim that Wis. Stat. § 995.15 is preempted by federal law; enforcement of the statute will cause irreparable harm to their businesses and, in the case of retail consumers, to their health; and a balance of harms and the public interests weigh in favor of granting the requested injunction.  In response, defendant argues that:  plaintiffs lack standing to bring their claims essentially seeking to protect actions already prohibited by federal law; and on the merits, the FDCA expressly preserves to states authority to regulate nicotine product sales in the manner set

7

forth in Wis. Stat. § 995.15.

## I.   Article III Standing

The court must begin by addressing defendant's argument that plaintiffs lack Article III standing, since if correct, federal subject matter jurisdiction would be lacking to proceed at all.  Article III of the United States Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *see* U.S. Const. art. III, § 2, cl. 2.  To have Article III standing, therefore, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Moreover, to establish an injury in fact, plaintiffs "must show that [they] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id*. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Defendant argues that plaintiffs' claim is not seeking a remedy for a legally protected interest given that the sale of unauthorized ENDS products is already prohibited under the FDCA.  However, as highlighted by other courts, this technical application of *Lujan's* requirement for a "legally protected interest" would lead to anomalous results.  *E.g.*, *Iowans for Alternatives to Smoking & Tobacco, Inc. ("IAS&T") v. Iowa Dep't of Revenue*, 781 F. Supp. 3d 724, 734 (S.D. Iowa 2025).  First, the interest is not akin to the illegal sale of narcotics as suggested by defendant.  Most notably, unlike a drug dealer, plaintiffs have a legitimate basis for believing that the FDA will continue its practice of allowing the ENDS market to

8

grown, except perhaps on a case-by-case basis. Indeed, under the FDA's current practice, plaintiffs arguably are engaged in legal economic activities. As a result, Wis. Stat. § 995.15 practically interferes with plaintiffs' reliance on a federal non-enforcement policy in a way that will meaningfully harm them, including in the form of lost sales, customers, goodwill, obsolete and sunk inventory, as well as imminent loss of access to unique products that avoid combustible cigarettes. Because these harms would flow directly from defendant enforcing Wis. Stat. 995.15, and may be redressed by a decision in plaintiffs favor, the court is satisfied that plaintiffs have alleged and established a concrete harm sufficient for Article III standing.[6]

## II. Implied Preemption

As for the merits, plaintiffs argue that Wis. Stat. § 995.15 is impliedly preempted by the FDCA, specifically 21 U.S.C § 337(a). "A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const., art. VI, cl. 2). The scope of a statute's preemptive effect, however, is guided by congressional intent: "the purpose of Congress is the ultimate touchstone" in every pre-emption case. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Moreover, because the states are independent sovereigns, the Supreme Court has "long presumed that

---

[6] As the U.S. District Court for Iowa pointed out in *IAS&T*, denying plaintiffs standing based on imperfect compliance with federal law could further allow states to avoid many preemption challenges simply by asserting noncompliance with the federal standard at issue, a result that would frustrate our federalist structure. *Id.* at *7; *see also* V*apor Tech. Ass'n v. Wooten*, No. 4:25-cv-00076-M-RJ, 2025 WL 1787420, *3 (E.D.N.C. June 27, 2025) (same).

Congress does not cavalierly pre-empt state-law causes of action." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). This is particularly so where Congress has "legislated … in a field which the States have traditionally occupied," giving rise to "the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id*.

Preemption can be express or implied. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984). Where, as here, an implied preemption claim is made, the court must consider whether "the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id*. If the state law would "prevent or frustrate" this federal objective, it is "nullified" by the Supremacy Clause. *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2000). An implied preemption inquiry is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). As a result, Congress' intent must be interpreted through the language it used in the FDCA, as well as the information available when Congress enacted and later amended the statute, including the historic regulatory authority over tobacco products, which is a field that the States traditionally occupied.

## A. The Interplay of Sections 337 & 387p of Title 21

The dispositive question here is whether statutory language and context demonstrate that Congress intended to preempt States' historic authority to prohibit sales of tobacco products, even if relying in part on the FDCA. That question is primarily answered by two sections of the FDCA, as amended by the TCA, in 21 U.S.C. §§ 337(a)

10

and 387p.  To begin, in 1938, when Congress first enacted the FDCA, it included § 337, which states that all proceedings to enforce or restrain violations of the FDCA "shall be by and in the name of the United States."  This section has been recognized by the Supreme Court to evidence Congress's intent to preempt the States' authority to enforce provisions of the FDCA.  *See Buckman Co. v. Plaintiff's Legal Comm.* 531 U.S. 341, 352 (2001) (§ 337(a) is "clear evidence that Congress intended that the [Medical Device Amendment ("MDA")] be enforced exclusively by the Federal Government").  As discussed below, many courts have applied this principle from *Buckman* to hold that state claims incorporating the FDCA are preempted.

However, unlike other areas regulated by the FDCA, when Congress enacted the TCA in 2009, it expressly reserved substantial regulatory authority to the States.  *See* 21 U.S.C. § 387p.  This section is comprised of three clauses.  First, the so-called "Preservation Clause" states that:

> except as provided in paragraph (2)(A), nothing in this subchapter ... shall be construed to limit the authority of a ... State or political subdivision of a State ... to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements under this subchapter ... relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age, information reporting to the State, or measures relating to fire safety standards for tobacco products.

11

21 U.S.C. § 387p(a)(l). [7]  Second, the Preservation Clause in turn is limited by the "Preemption Clause," which prohibits state regulations "different from or in addition to," TCA requirements "relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products." § 387p(a)(2)(A).  Third, Congress included a "Savings Clause" to reiterate that the Preemption Clause "does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, the advertising and promotion of, or use of, tobacco products by individuals of any age[.]" § 387p(a)(2)(B).

Courts have found that the inclusion of these three clauses in § 387p was a deliberate choice by Congress not to "broadly jettison[ ] the longstanding tradition of states and localities' role in the regulation of sales of tobacco products when it enacted the TCA in 2009." *R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*, 29 F.4th 542, 549-50 (9th Cir. 2022); *see also R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170 (8th Cir. 2023)*; Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence*, 731 F.3d 71 (1st Cir. 2013); *U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York*, 708 F.3d 428 (2d Cir. 2013).  Even so, analyzing these clauses together leaves room to argue about Congress's actual intent to preempt

---

[7] At oral argument and in their supplemental brief, plaintiffs also assert that the language "nothing in this subchapter" requires a holding that § 337(a), a section outside of the subchapter, is not preempted by § 387p.  However, this contradicts the Supreme Court's instruction that "a specific policy embodied in a later federal statute should control [the court's] construction of the [earlier] statute, even though it ha[s] not been expressly amended." *United States v. Estate of Romani*, 523 U.S. 517, 530-531 (1998) (collecting cases).  Moreover, for reasons discussed above, the language is § 387p does just that.

States' laws, especially relying in part on requirements of the TCA in enacting law that prohibit tobacco product sales.

While § 337(a) does state that enforcement of the FDCA shall only be "by and in the name of the United States," the TCA also includes an express statement that preserves to the States authority to prohibit tobacco products sales by enacting laws with requirements that are "in addition to or more stringent than" the TCA. Thus, at minimum, Congress intended that States use the TCA as a floor for further restrictions on tobacco product manufacturers from accessing their markets. The language of the Savings Clause also suggests Congress's apparent intent that States retain the ultimate authority to prohibit the sale of a tobacco product altogether, regardless of its compliance with TCA provisions. *See Cnty. of Los Angeles*, 29 F.4th at 560 ("the better understanding [of § 387p] is that Congress intended to allow the federal government the sole authority to set tobacco product standards, while retaining for states and localities their longstanding authority to say: 'not here'").

In opposition, plaintiffs argue that consideration of the Preservation and Savings Clauses of § 387p is a red herring because neither "bar the ordinary working of conflict preemption principles." *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000). However, this is merely a reminder that "ordinary pre-emption principles" apply when analyzing these clauses, including review of the entire statutory context. *Buckman*, 531 U.S. at 352. Plaintiffs also argue that this case merely requires a straightforward application of § 337(a) preemption, just as in *Buckman*, but this ignores material differences in the relevant statutory language and context.

13

In *Buckman*, there was no clause preserving state authority to regulate disclosures during the FDA's medical device approval process or saving it from preemption. Moreover, the Supreme Court noted that "policing fraud against federal agencies is hardly a field the States have traditionally occupied," *Id.* at 347 (quotations omitted), emphasizing that "[s]tate law fraud-on-the-FDA claims would inevitably conflict with the FDA's responsibilities." *Id.* at 350. Indeed, the Court emphasized that "complying with the FDA's regulatory regime in the shadow of 50 states' tort regimes would dramatically increase the burdens facing applicants -- burdens not contemplated by Congress in enacting the FDCA and the MDA." *Id.*

In contrast, tobacco product regulation has long been subject to state authority; Congress expressly sought to preserve the States authority by including § 387p; and the language of 387p affirmatively grants States the authority to enact and enforce laws that impose additional, even *more* stringent, requirements on manufacturers before their tobacco products may be sold in an individual state. *See Cnty. of Los Angeles*, 29 F.4th at 561 ("Given that the TCA does not mandate that certain flavors must remain available for sale, and expressly preserves local authority to enact sales regulations more stringent than the TCA, the County's sales ban does not stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress expressed in the TCA.") (quotations omitted).

Plaintiffs cites a number of other opinions holding that state law claims depending on violations of the FDCA were preempted, but these cases are similarly distinguishable on critical facts: none involve tobacco products or the TCA's Preservation and Savings

14

Clauses. *See Nexus Pharmaceuticals, Inc. v. Central Admixture Pharmacy Services, Inc.*, 48 F. 4th 1040 (9th Cir. 2022) (drugs); *Novo Nordisk Inc. v. Live Well Drugstore, LLC*, No. 23-cv-808, 2025 U.S. Dist. LEXIS 17792 (M.D. Fla. Jan. 30, 2025) (drugs); *Regan v. Sioux Honey Association Cooperative*, 921 F. Supp. 2d 938 (E.D. Wis. 2013) (food); *Loreto v. Proctor & Gamble Co.*, 515 Fed. Appx. 576 (6th Cir. 2013) (drugs). With respect to those few cases cited by plaintiff that *do* involve the regulation of tobacco products, most simply apply *Buckman* without analysis of the effect of the Preservation and Savings Clauses. *See State ex rel. Attorney General Dave Yost v. Elevate Smoke, LLC*, No. A-2403034, 2025 WL 579637 (Ohio Com. Pl., Hamilton Cnty. Feb. 20, 2025); *State ex rel. Attorney General Dave Yost v. Orville Tobacco and Vape Shop*, No. 2024-CVC-H-0327, 2025 WL 432823 (Ohio Com. Pl., Wayne Cnty. Feb. 5, 2025); *State ex rel. Attorney General Dave Yost v. Central Tobacco*, No. 24-CV-H-0064, 2024 WL 4626167 (Ohio Com. Pl. Delaware Cnty. Oct. 29, 2024); *Yimam v. Myle Vape, Inc.*, No. 2019 CA 008050 B, 2020 WL 13614925 (D.C. Super. June 11, 2020). Having failed to examine the relevant textual evidence for Congress' intent, the court is unpersuaded that the FDCA preempts regulation of tobacco products by the states. *See Crosby*, 530 U.S. 363, 373 (2000) (implied preemption analysis requires "examining the federal statute as a whole.").

Plaintiffs do cite *one* case that applies *Buckman* in the way they suggest, however, even its analysis is unpersuasive. In *IAS&T*, as here, the Iowa District Court was asked to decide whether an Iowa statute's dependence on federal authorization status, "place[d] Iowa in the position of making its own judgments about which federal requirements to enforce and how stringently to enforce them . . . interfere[ing] with the methods by which

15

the federal statute was designed to reach [its] goal." *Id.* at *12 (quotations omitted). However, that reasoning appears to be in direct conflict with the express language used by Congress in the Preservation Clause, which expressly authorizes States to enact and enforce laws that are "in addition to, or more stringent than, requirements established under [the TCA]." Additionally, this court disagrees with the conclusion in *IAS&T* that merely relying on the FDCA in part in regulating tobacco products means that it is enforcing it. Regardless, a violation of the FDCA is not itself actionable basis for the DOR to initiate proceedings against the producers, distributors, retailers and customers of tobacco producers. *See Vapor Tech. Ass'n v. Wooten*, No. 4:25-cv-00076-M-RJ, 2025 WL 1787420, *5 (E.D.N.C. June 27, 2025) (finding similar state law conditioning certification on FDA authorization was not enforcing the FDCA). Rather, action may only be initiated by the sale of a product not on the Wisconsin directory, which includes TCA compliant and noncompliant products.

Because the power to enact and enforce the same or *additional* sales requirements is expressly preserved to the States after adopting the TCA, at least so far as tobacco product requirements are created by state law, the question remains what, if anything, Congress intended in limiting enforcement of the FDCA to the federal government in § 337(a). With this in mind, the court turns to whether Wis. Stat. § 995.15 imposes a permissible prohibition under the provisions of the FDCA or is impliedly preempted.

## B. Section 995.15

As noted above, Wis. Stat § 995.15 requires manufacturers of electronic vaping devices to make one of the following certifications to the DOR to avoid daily forfeitures:

16

(1) the device received a marketing authorization or similar order from the FDA pursuant to 21 USC 387j; (2) the device was on the market as of August 8, 2016, an associated PMTA for that device was submitted to the FDA on or before September 9, 2020, and that application remains under review or a final decision has not otherwise taken effect; or (3) the device contains hemp and does not contain nicotine.  On its face, this requirement would certainly appear to place an *additional* burden on tobacco product manufacturers hoping to sell their ENDS products in Wisconsin, which is exactly the power preserved to the States in the TCA.  21 U.S.C. § 387p(a)(l).  Nevertheless, plaintiffs argue that by relying on the FDCA provisions for tobacco products, § 995.15 "would effectively allow a state to write section 337(a) out of the FDCA and render it inoperative for any state-law tobacco-product restriction that could be characterized as a 'sales requirement.'"  (Dkt. #47 at 19.)  However, Congress explicitly left the authority to States to enforce legislation imposing additional sales requirements.  To find a sales requirement preempted because it made sales more difficult for tobacco product manufacturers simply because it acknowledged a floor set by the federal government would appear to ignore Congress' intent that each state have final authority on what tobacco products may be sold in its marketplace.

Of course, plaintiffs argue that this interpretation would make the Preemption Clause a nullity because any of its provisions could be ignored by characterizing it as a "sales requirement."  This interpretation ignores the already limited scope of the Preemption Clause, which only restricts States from "establish[ing] or continu[ing] in effect with respect to tobacco products any requirement which is different from, or in

17

addition to, any requirements under the [TCA]." 21 U.S.C. § 387p(2)(A). Logically, this allows states to continue or establish requirements that are the same as the TCA in both the listed and unlisted categories.[8] Regardless, the Savings Clause states that the Preemption Clause "does not apply to requirements relating to the sale . . . of tobacco products," suggesting that the Preemption Clause was never intended to limit a States' ability to enact sales restrictions on the sale of tobacco products, regardless of the form they take. This is especially compelling given that, as plaintiffs acknowledge, States have the flexibility to outright ban all tobacco products, as well as limiting bans to specific categories.

Still, plaintiffs argue that by stating in the Preservation Clause that "nothing in [the TCA], or rules promulgated under [the TCA] shall be construed to limit the authority of" a State to adopt laws "prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products *by individuals of any age*," § 387p(a)(1) (emphasis added), Congress merely intended to preserve a State's right to adopt a minimum age for use of tobacco products different from that set by the federal government. While this may be part of Congress's intent, it is also wholly consistent with Wis. Stat. § 955.15, which prohibits the sale of certain tobacco products to individuals of any age.

---

[8] In their supplemental brief, plaintiffs argue that Wis. Stat § 995.15 creates new obligations for ENDS manufacturers that solely operate intrastate and are not subject to the "FDCA's premarket review requirements." However, in making this argument, plaintiffs seemingly concede that Wisconsin's regulation of these businesses cannot be preempted because, as they argue, there is no federal law regulating them. The other alternative, that these entities are free of any regulation compelling premarket review, is not tenable with the realities of this heavily regulated market.

Finally, plaintiffs argue that because the *Buckman* opinion had been issued eight years before the TCA was enacted, Congress was aware of the Supreme Court finding that the FDCA, as amended by the TCA, impliedly preempted any "fraud-on-the-FDA" claims under state law for medical devices. Specifically, plaintiffs further argue in light of this history, that if Congress had intended the Preservation and Savings clauses to limit § 337(a)'s implicit preemption effect, it would have included express language similar to §337(b), which allows state enforcement of FDCA food provisions under certain circumstances. Of course, this argument cuts both ways, since *Buckman*'s implied preemption test may well have prompted Congress to include these very Preservation and Savings Clauses as a directive that States *retain* the authority to enact and enforce additional requirements for the sale of tobacco products, something the *Buckman* court found was not true for medical devices. Given these two options, this court must assume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice*, 331 U.S. at 230. Based on the full text of the TCA and FDCA, therefore, the court finds it unlikely that Congress intended to preempt the States' authority to enact and enforce laws restricting the sale of tobacco products that rely in part on TCA requirements, such as Wis. Stat. § 995.15, especially where it obviously knew how to do so expressly for labelling and advertising of tobacco products in § 1334. Accordingly, the court also finds plaintiffs have not met their

burden to demonstrate a reasonable likelihood of prevailing on the merits and are not

entitled to preliminary injunctive relief.    *See Winter*, 555 U.S. at 20.[9]

### III.  Irreparable harm

On the other hand, plaintiffs have established a reasonable likelihood that they will

suffer irreparable harm if Wis. Stat. § 995.15 takes effect illegally.  As an initial matter,

plaintiffs need not show that every possible modification to their businesses is likely to be

unsuccessful to prove irreparable harm. *See Galvin v. New York Racing Ass'n*, 70 F. Supp. 2d

163, 170 (E.D.N.Y. 1998) ("[T]he loss of business need not be total, so long as it is so

great as to seriously compromise the company's ability to continue in its current form.")

(emphasis added); cf. *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir.

1995) ("Where the loss of a product will cause the destruction of a business itself or

indeterminate losses in other business [because, for example, the product attracted

customers who make purchases of other goods while buying the product in question] . . . a

preliminary injunction [is] appropriate."); *VanDerStok v. Garland*, 633 F. Supp. 3d 847,

855 (N.D. Tex. 2022) ("But even costs that are recoverable from another source (e.g., by

cost-shifting to customers or offering alternate products) may constitute irreparable harm

where the loss threatens the very existence of the movant's business" (cleaned up)).

Here, plaintiffs have presented substantial evidence demonstrating that Wis. Stat.

§ 995.15 will significantly limit the ability for businesses to operate gainfully and

---

[9] Because the Seventh Circuit has advised that absent a finding of a reasonable likelihood of success on the merits, "district courts [should still] examine, if only briefly, all four preliminary injunction considerations," the court will turn to the remaining considerations. *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 730 (7th Cir.1998).

consumers to get ENDS products of their choice.  In particular, retailers have attested to the fact that a niche market for specialized ENDS products for tobacco consumption comprise most of their revenue from August 1, 2024, to July 31, 2025, and would be prohibited once Wis. Stat. § 995.15 takes effect.  Additionally, plaintiffs provide compelling evidence to believe that the loss of customers coming into retail stores to purchase products no longer eligible for sale will similarly reduce cross-sales of their non-tobacco products, such as snacks and apparel.  Plaintiffs have also presented evidence that switching to carrying the few industry products that *are* currently compliant with Wis. Stat. § 995.15 is not feasible because other competitors in the industry -- such as gas stations and convenient stores -- already sell those same products at discounts under arrangements with manufacturers reserving shelf space for traditional combustible cigarettes.  The likely ripple effects of these lost sales on wholesalers and manufacturers of niche ENDS products, as well as the ultimate consumers, seem equally likely.

Perhaps most importantly, plaintiffs harm is further exacerbated by the fact that the defendant, a Wisconsin state agency, is *immune* from claims for money damages under the doctrine of sovereign immunity, should § 995.15 ultimately be found preempted.

## IV.  Balance of Harms and Public Interest

Plaintiffs acknowledge that in cases where a party's constitutional rights are claimed to be threatened, the court's finding as to the parties' likelihood of success on the merits drives the "balance of harms" analysis, "because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012).  This sentiment is echoed by

defendant, who argues that a state suffers irreparable injury whenever its validly enacted laws are enjoined. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).

Accordingly, since this court has concluded that plaintiffs have failed to demonstrate a reasonable likelihood of success on the merits, they have also failed to demonstrate that the balance of harms and public interest weigh in favor of enjoining state enforcement of Wis. Stat. § 995.15.

Indeed, plaintiffs unexplained delay in bringing suit until just before the statute takes effect offsets the arguably limited harm in further extending enforcement for a few more months given the state's repeated extensions of the date enforcement would begin. Regardless, the court sees little likelihood of the state or even a private citizen ramping up enforcement before plaintiffs will have an opportunity to seek emergency relief from the Seventh Circuit.

## ORDER

IT IS ORDERED that plaintiffs' Motion for Preliminary Injunction, dkt. #15, is DENIED.

Entered this 5th day of September, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge